[Cite as *State v. Litten*, 2014-Ohio-577.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| STATE OF OHIO | C.A. No.    26812 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JOSEPH R. LITTEN | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.    CR 12 07 2103 |

DECISION AND JOURNAL ENTRY

Dated: February 19, 2014

WHITMORE, Judge.

{¶1}    Defendant-Appellant, Joseph Litten, appeals from his convictions in the Summit County Court of Common Pleas.  This Court affirms in part and reverses in part.

I

{¶2}    During the early afternoon hours of July 16, 2012, Litten took his daughter, C.S., to visit his 86 year old grandmother, Helen Litten.  After arriving at Helen's house, Litten asked his grandmother to accompany him into the other room to look at his ruptured hernia.  Litten left C.S. at the kitchen table.  Once he was alone with his grandmother, Litten dropped his pants and began fondling himself.  He then grabbed onto his grandmother, forced his hand into her underwear, and repeatedly inserted his fingers into her vagina.  When the attack ended, Litten left his grandmother in the family room, collected his daughter, and went home.  Litten later told the police that he never left his house that day.

{¶3}  A grand jury indicted Litten on one count of rape, in violation of R.C. 2907.02(A)(2), and one count of kidnapping, in violation of R.C. 2905.01(A)(4).  A jury trial ensued, and the jury found Litten guilty on both counts.  The trial court sentenced Litten on both counts and ordered his sentences to run consecutively for a total of 20 years in prison.

{¶4}  Litten now appeals and raises six assignments of error for our review.  For ease of analysis, we reorder several of the assignments of error.

II

Assignment of Error Number Four

JOSEPH LITTEN'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶5}  In his fourth assignment of error, Litten argues that his convictions are against the manifest weight of the evidence.  We disagree.

{¶6}  In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).  A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other.  *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).  Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.  *Id.*  Therefore, this Court's "discretionary power to grant a new trial

should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶7} Under R.C. 2907.02(A)(2), rape occurs when a person uses force or the threat of force to purposely compel another person to engage in sexual conduct. A kidnapping occurs when a person, "by force, threat, or deception, * * * remove[s] another from the place where the other person is found or restrain[s] the liberty of the other person * * * [t]o engage in sexual activity." R.C. 2905.01(A)(4). According to Litten, the jury lost its way in convicting him of rape and kidnapping because Helen's testimony was not believable and the DNA evidence against him was weak.

{¶8} Deborah Bender, Litten's aunt, testified that she and her husband, Robert, lived with her mother, Helen. On the day of the alleged incident, Deborah and Robert left the house in the early afternoon. Deborah noticed that Helen was acting "kind of scared" when they returned. She followed Helen into the bathroom when Helen asked to speak with her privately. Once inside the bathroom, Helen told Deborah: "Joe molested me." Deborah understood "Joe" to be her nephew, Litten. She also observed blood-tinged toilet paper in the bathroom, which Helen indicated she had used to wipe herself after the attack. Deborah testified that she interacts with Helen on a daily basis and that Helen does not suffer from any issues that might impact her mental faculties.

{¶9} Helen, who was 86 years old at the time these events transpired, testified that she was home alone when her grandson, Litten, repeatedly called the house. The first two times, Litten called looking for Robert and asked whether Robert and Deborah were home yet. The third time, he called to ask if he and his daughter, C.S., could come over. Helen assented, and

Litten and C.S. arrived shortly thereafter. Helen came outside to greet Litten and C.S. Because there were several steps leading back up into the house, Litten placed his hand on the back of Helen's waist to assist her in climbing the steps. C.S. sat down at the kitchen table once inside and remained there until she and Litten left.

{¶10} Helen testified that Litten wanted to show her his ruptured hernias, but did not want C.S. to see them. Helen followed Litten as he walked into the family room. Once the two were in the family room, Litten pulled down his pants. Helen testified that Litten pulled down his pants to knee-level and was not wearing any underwear. The two briefly discussed Litten's hernia. Litten then began touching himself, and Helen tried to go back into the kitchen. Litten grabbed Helen tightly and refused to let her go. According to Helen, she "kept on hollering leave me alone Joe," but Litten refused to listen.

{¶11} Helen testified that, during the encounter, Litten grabbed one of her breasts, bruising it. She testified that, as Litten held her, he slipped one arm around her side, pulled down the back of her underwear, and used his hand to penetrate her vagina. Litten repeatedly "push[ed] his hand in and out of [her] vagina" as Helen screamed at him and tried to push him away. Helen testified that "some way or other" she wound up on the floor, with her legs curled beneath her and her side pressed up against a chair in the family room. Helen continued to scream at Litten, but he stood over her and once again penetrated her vagina with his hand by reaching down the back of her underwear. According to Litten, she "finally [] got to [Litten] enough to tell him to leave [her] alone," and he removed his hand. Litten then bent over Helen and "French kissed [her]." Helen told Litten to get out, and he left the house through the kitchen.

{¶12} Helen testified that she experienced a great deal of pain after Litten attacked her and used toilet paper to wipe herself because she was bleeding. Later that day, Helen spoke to

the police and agreed to undergo an exam at the hospital. Jill Bunnell, a forensic nurse examiner, performed Helen's exam and testified regarding her observations.

{¶13} Bunnell agreed that Helen was coherent throughout the exam and did not appear to have any trouble understanding and relating information. Bunnell listened as Helen told her that Litten had fondled himself, grabbed her left breast, kissed her, and digitally penetrated her vagina. Bunnell noted that Helen had several bruises on her arms and a bruise on her left breast. When Bunnell performed Helen's exam, she observed redness at the vaginal opening as well as swelling and abrasions to the surrounding area. Bunnell testified that the injuries she observed were consistent with the history that Helen had related.

{¶14} Several members of the Bureau of Criminal Identification and Investigation ("BCI") testified regarding the DNA results they were able to obtain. Christine Hammett, a forensic scientist in BCI's biology unit, testified that she swabbed the interior of Helen's underwear, the interior and exterior of the waistband of her pants, and the left breast area of her shirt. Hallie Garofalo, a forensic scientist in BCI's DNA unit, then performed Y-STR DNA testing on the swabs. Garofalo explained that, unlike traditional DNA testing, Y-STR DNA testing focuses solely on the genetic markers at the Y-chromosome, so it can identify male DNA within a sample of mixed male and female DNA. Garofalo testified that she was able to find a partial male DNA profile on the swab from the interior of Helen's underwear and that the partial profile was consistent with Litten's profile. Thus, neither Litten nor any of his paternal male relatives could be eliminated as the source of the profile Garofalo uncovered. Litten also could not be excluded as the source of DNA found on Helen's shirt. Christopher Smith, another forensic scientist in BCI's DNA unit, performed traditional DNA testing on the swab taken from

the left breast area of Helen's shirt.  He testified that the major DNA profile he found on the swab was consistent with Litten's DNA.

{¶15}  Detective David Garro interviewed Helen at her house within several hours of the incident.  He testified that Helen was "cogent and fully aware of what was going on" when he interviewed her.  Helen told Detective Garro that Litten had pulled his pants down, grabbed her breast through her shirt, pushed her down into the chair, and digitally penetrated her.  On cross-examination, Detective Garro admitted that he could not remember Helen telling him that she had wound up on the floor next to the chair with her legs underneath her.  Detective Garro noted in his report that the assault had taken place in the chair.

{¶16}  After speaking with Helen, Detective Garro went to Litten's residence to interview him and his daughter, C.S.  Detective Garro separated the two and spoke to Litten first.  Litten told Detective Garro that he had been home all day because his car would not start.  Detective Garro indicated that he asked Litten if he had gone anywhere "many, many times," but Litten was adamant that he "absolutely had not been anywhere."  Litten even offered to let Detective Garro try to start his car so that he could see it was not working.

{¶17}  Detective Garro spoke to C.S. next.  C.S. told Detective Garro that she and her father had gone to Helen's house earlier in the day and had stopped at a gas station beforehand.  C.S. indicated that she did not say goodbye to Helen before leaving the house with her father.  Additionally, she told Detective Garro that Litten changed his clothes when they got back home.

{¶18}  After speaking with C.S., Detective Garro decided to canvass the neighborhood to see whether any of the neighbors had observed Litten leaving the house earlier that day.  Detective Garro was still walking down the street 30 to 40 minutes later when C.S. came out of her house and approached him.  According to Detective Garro, C.S.'s "demeanor was 180

degrees from what it had been earlier when [he] had spoken to her" and she was "crying and shaking." C.S. told Detective Garro that she had lied to him earlier and that she and her father had been at home all day.

{¶19} Subsequently, Detective Garro procured the surveillance tapes from the gas station where C.S. originally said she and her father went before driving to Helen's. Detective Garro reviewed the footage from the tapes and observed Litten drive to the gas station in the same car Litten had claimed would not start. He further observed Litten enter the gas station and make a purchase at the register. The timestamp on the tapes put Litten at the gas station at 2:41 p.m. on the day of the alleged attack.

{¶20} Litten testified in his own defense at trial. Litten admitted that he went to Helen's house on the day of the incident, that he lied to Detective Garro in his interview, and that he instructed C.S. to talk to Detective Garro again and recant her statement once he realized that she had not corroborated his own statement. According to Litten, he called Helen's house several times on the day of the incident because he was looking for Robert, Helen's son-in-law. Litten testified that he and Robert had made an arrangement to exchange Robert's pain medication for some marijuana Litten had procured. Litten testified that he needed the pain medication for his hernia because it was very painful and his doctor had refused to prescribe him anything to manage the pain.

{¶21} Litten testified that C.S. remained at Helen's kitchen table while he and Helen walked into the other room. According to Litten, he never pulled down his pants to show Helen his hernia. Litten claimed that he simply unzipped his pants and rolled them back to reveal his lower abdomen. Litten further claimed that Helen became angry with him because she learned that he had brought marijuana into the house and intended to exchange it for Robert's pain pills.

Litten testified that Helen yelled at him loudly because she did not have her hearing aids in and he "stuck [his] hands out on her" because "she was spitting in [his] face." Litten denied ever sexually assaulting Helen. He claimed that he initially lied to Detective Garro and ordered C.S. to do so because he was afraid he would get in trouble for the marijuana. Further, he insisted that his hernia was extremely painful and impeded any strenuous physical activity on his part. When called on rebuttal, however, Detective Garro testified that Litten resisted when they went to arrest him and that Litten "demonstrated resistance and strength."

{¶22} C.S. also testified at trial. Several witnesses testified that C.S. was developmentally challenged, and Litten testified that C.S. had been diagnosed as "borderline autistic." C.S. testified that she was 14 years old at the time of trial. C.S. remembered going to Helen's house on the day of the incident, but could not recall if Litten and Helen had ever gone into another room. She did testify, however, that there came a point in time where she was alone in the kitchen. C.S. stated both that she did not know if she heard anyone screaming while she was at the house and that she never heard Helen cry out for help. She testified that she left the house without saying goodbye to Helen and that Litten changed his clothes when they got home.

{¶23} First, Litten argues that his convictions are against the manifest weight of the evidence because Helen's testimony was problematic in several respects. According to Litten, there were significant variations in the descriptions of the attack Helen gave at trial, to Detective Garro, and to Bunnell. For instance, Detective Garro thought the attack had taken place in the chair in the family room rather than on the floor next to it. Moreover, while Helen testified at trial that Litten kissed her after he withdrew his hand, Bunnell reported that the kiss took place before any penetration occurred. Litten further argues that Helen seemed confused at several

points during her testimony and that her claim that she had yelled at Litten throughout the attack was not believable, as C.S. testified that she never heard any screaming.

**{¶24}** Multiple witnesses who had interacted with Helen on either one or many occasions testified that she was coherent and did not appear to have any problems with her mental faculties. Consistent with her statements to Detective Garro and Bunnell, Helen testified at trial that Litten grabbed her left breast and digitally penetrated her. To the extent that there were some variations in her recitation of the events, the jury was in the best position to "weigh [her] credibility and resolve the conflicts in the testimony." *State v. Andrews*, 9th Dist. Summit No. 25114, 2010-Ohio-6126, ¶ 28. Although C.S. did not testify that she heard Helen screaming, it is noteworthy that Litten's version of the events also encompassed screaming on the part of Helen. In particular, Litten testified that Helen screamed at him loudly and kicked him out because he had brought marijuana into the house. Nevertheless, C.S. stated that she did not recall anyone screaming. As such, the jury could have chosen to believe Helen's version of the events, despite C.S.'s testimony. *See id.*

**{¶25}** Second, Litten argues that his convictions are against the manifest weight of the evidence because the DNA evidence against him was weak. He argues that his DNA could have gotten onto Helen's clothes when he placed his hand on her waist to help her up the stairs and "stuck [his] hands out on her" when she was yelling at him. Y-STR DNA testing also confirmed, however, that DNA consistent with Litten's was found on the interior of Helen's underwear. While that DNA encompassed all of Litten's paternal relatives as well, the testimony was such that he was the only male member of his family around Helen at the time of these events. Having reviewed the record, we cannot say that the jury lost its way in choosing to believe the State's version of the events over Litten's. *See id.* ("A verdict is not against the

manifest weight of the evidence because the jury chose to believe the State's witnesses rather than the defense witnesses."). Litten's argument that his convictions are against the manifest weight of the evidence lacks merit. His fourth assignment of error is overruled.

<u>Assignment of Error Number One</u>

THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO *SUA SPONTE* INQUIRE INTO JUROR MISCONDUCT OR DECLARE A MISTRIAL, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

**{¶26}** In his first assignment of error, Litten argues that the trial court erred by not sua sponte granting a mistrial. We disagree.

**{¶27}** "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "The essential inquiry on a motion for mistrial is whether the substantial rights of the accused are adversely affected." *State v. Wooden*, 9th Dist. Summit No. 21138, 2003-Ohio-1917, ¶ 33, quoting *Wadsworth v. Damberger*, 9th Dist. Medina No. 3024-M, 2000 WL 1226620, *2 (Aug. 30, 2000). If a defendant fails to move for a mistrial once he discovers the grounds that would form the basis for his motion, then he forfeits all but a claim of plain error. *State v. Wood*, 9th Dist. Medina No. 06CA0044-M, 2007-Ohio-2673, ¶ 21-23. *Accord State v. Terry*, 9th Dist. Summit No. 23043, 2007-Ohio-6790, ¶ 9 ("[W]here the defense [does] not expressly request the alleged juror misconduct to be remedied at trial or express some form of dissatisfaction with the way the trial court handled the matter, in the absence of plain error, the claim is [forfeited].").

> Under Crim.R. 52(B), [p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court. By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule. Second, the error must be plain. To be plain within the meaning of Crim.R. 52(B), an error must be an obvious defect in

the trial proceedings. Third, the error must have affected substantial rights. We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.

(Internal citations and quotations omitted.) *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). The burden is on the party asserting plain error to prove that "the outcome 'would have been different absent the error.'" *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 17, quoting *State v. Hill*, 92 Ohio St.3d 191, 203 (2001).

{¶28} Litten argues that the trial court should have ordered a mistrial sua sponte after one of the jurors supplied Detective Garro with a word during his testimony. In particular, during the testimony regarding Litten's statement to Detective Garro that he had been home the entire day on the day of the incident, the following exchange took place:

[PROSECUTOR:] * * * [W]hat did you ask [Litten] about?

[DETECTIVE GARRO:] I asked him if he had been over to [Helen's] house that day over on Mores Street.

[PROSECUTOR:] And what did he tell you?

[DETECTIVE GARRO:] He told me he hadn't. He told me he'd been home all day; hadn't left. He and [C.S.] had cleaned the house, done laundry, cooked hamburgers for lunch. The car in the driveway, the black car, it wouldn't even run, there was something wrong with the catalytic converter. He absolutely had not been anywhere.

[PROSECUTOR:] Did you ask him once or did you [] give him an opportunity to correct his statement?

[DETECTIVE GARRO:] We went over this several times. The question was posed many, many times.

[PROSECUTOR:] And did he ever back off his position that he didn't leave his house that day?

[DETECTIVE GARRO:] No, he was absolutely – absolutely – what's the word I'm looking for –

A JUROR: Firm.

[DETECTIVE GARRO:] Firm, absolutely firm on the conviction that he had never left the house. And even after I talked to [C.S.] privately and she told me they had left.

There was neither an objection, nor an instruction from the court after the juror spoke out. Litten argues that the juror's "active participation" denied him his right to a fair trial.

{¶29} "Due process means a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). "However, *Smith* holds that the party complaining about juror misconduct must establish prejudice." *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 42. *Accord State v. Morris*, 9th Dist. Summit No. 25519, 2011-Ohio-6594, ¶ 32 ("There is no question that Juror 8 committed misconduct; therefore, the issue is whether Mr. Morris suffered any prejudice as a result of the misconduct."); *State v. Herb*, 167 Ohio App.3d 333, 2006-Ohio-2412, ¶ 6 (9th Dist.).

{¶30} Although it was clearly improper for a member of the jury to speak out and supply Detective Garro with a word as he was testifying, Litten has not shown that the juror's misconduct affected the outcome of his trial. *See Adams* at ¶ 42; *Barnes*, 94 Ohio St.3d at 27. At the point that the juror interjected, Detective Garro had already testified that he went over Litten's story with him "many, many times" and that Litten said he "absolutely had not been anywhere." Moreover, Detective Garro had already answered "no" in response to the prosecutor's question about whether Litten had "ever back[ed] off his position" before he began to elaborate. The juror's interjection, therefore, came at a point when Detective Garro was reiterating the point he had already made. Additionally, the word that that the jury supplied was innocuous. It carried neither a positive nor a negative connotation with it. Rather, it simply described Litten as being set in the explanation he gave to Detective Garro.

**{¶31}** The testimony about Detective Garro's interview with Litten was not the only evidence in support of Litten's guilt. Helen testified in detail about the attack and identified Litten as the perpetrator. Bunnell, who conducted Helen's sexual assault exam, testified that Helen displayed numerous physical injuries during her sexual assault exam that were consistent with the history she gave. Additionally, the State introduced DNA evidence linking Litten to the DNA profile found on the left breast area of Helen's shirt and linking Litten and his male relatives to the partial DNA profile found on the swab taken from the interior of Helen's underwear. Given all of the evidence the State introduced at trial, we cannot conclude that Litten has shown that the result of his trial would have been different, but for the juror's misconduct.

**{¶32}** Litten's argument also contains a brief reference to a handful of cases discussing structural error. In structural error situations, an appellant need not demonstrate prejudice because the error itself is "so intrinsically harmful" that its presence makes reversal "automatic." *State v. Hill*, 92 Ohio St.3d 191, 196 (2001). Structural error has only been found to exist, however, "in a 'very limited class of cases.'" *Id.* at 197, quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997). These situations entail a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Hill* at 197. This case does not involve any of the classic structural error situations, *see id.*, and Litten has not developed his argument so as to explain why this situation amounted to structural error. *See* App.R. 16(A)(7). We decline to create a structural error argument on his behalf. *See Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998) ("If an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out."). Litten's first assignment of error is overruled.

Assignment of Error Number Two

THE PROSECUTOR'S REMARKS IN CLOSING ARGUMENT WERE PROSECUTORIAL MISCONDUCT AND DEPRIVED JOSEPH LITTEN OF HIS RIGHT TO A FAIR TRIAL IN VIOLATION OF HIS 5TH, 6TH, AND 14TH AMENDMENT RIGHTS UNDER THE U.S. CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶33}** In his second assignment of error, Litten argues that his due process rights were violated when the prosecutor engaged in misconduct during closing argument. We disagree.

**{¶34}** In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." *State v. Knight*, 9th Dist. Lorain No. 03CA008239, 2004-Ohio-1227, ¶ 6, citing *State v. Carter*, 72 Ohio St.3d 545, 557 (1995). The defendant must show that, but for the prosecutor's misconduct, the trier of fact would not have convicted him. *State v. Lollis*, 9th Dist. Summit No. 24826, 2010-Ohio-4457, ¶ 24. "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 140, quoting *Phillips*, 455 U.S. at 219.

**{¶35}** Litten argues that he was denied his right to a fair trial when the prosecutor committed certain misconduct during the rebuttal portion of the State's closing argument. In his brief, Litten cites to several particular instances of alleged misconduct. First, he argues that the prosecutor "impugn[ed] [his] counsel's performance" when he argued:

> The State has the burden to prove a case but not to refute any and all speculation that the defense throws up there. They could have put somebody up there medical or otherwise to establish there was some problems. He didn't even ask [Helen] if she was incontinent because why would you want to focus on the facts? Why would you want to do anything to undermine his speculation and fantasy as to why logic and common sense that shows his client is anything other than guilty?

Second, he argues that the prosecutor gave an inflammatory argument when he suggested that he should apologize to Litten for being "the unluckiest man on the planet" and when he repeatedly called Litten an "admitted liar." Third, he argues that the prosecutor bolstered Helen's credibility by stating that "[n]obody with a straight face could look at you and say [she] came in here and lied to you." Fourth, he argues that the prosecutor improperly expressed a personal opinion and sought to capture the jury's sympathy when he commented that he felt bad the State had to call C.S. and described her as "[p]oor, poor [C.S.] who's stuck in the middle between two people that she loves." Finally, Litten argues that the prosecutor undermined his right to a fair trial when he argued:

> So you wonder after a while why are we here? Why did you have to listen to these details? Why did we spend the last two and a half days? I mean, what's the point? Because even the guilty have the right to a trial. That's what makes our country great.

The only objection Litten lodged to all of the foregoing remarks by the prosecutor was to the prosecutor's use of the term "fantasy" in the first block quote above. Yet, his objection was not that the prosecutor's comment impugned his counsel's performance. It was simply that the prosecutor's use of the term "fantasy" was "inappropriate." Accordingly, the record reflects that Litten did not object to any of the alleged misconduct he cites.

{¶36} When a defendant fails to object to alleged prosecutorial misconduct, he or she forfeits all but plain error. *State v. Chapman*, 9th Dist. Lorain No. 07CA009161, 2008-Ohio-1452, ¶ 23. Under Crim.R. 52, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." As previously set forth, the burden is on the party asserting plain error to prove that "the outcome 'would have been different absent the error.'" *Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, at ¶ 17, quoting *Hill*, 92 Ohio St.3d at 203.

{¶37} "The prosecutor is given considerable latitude in closing arguments." *State v. Reed*, 9th Dist. Wayne No. 12CA0051, 2013-Ohio-3970, ¶ 58. "A prosecutor may comment upon the testimony of witnesses and suggest the conclusions to be drawn." *State v. Elder*, 9th Dist. Summit Nos. 25217 & 25259, 2011-Ohio-294, ¶ 22. Additionally, a prosecutor may "characterize a witness as a liar * * * if the evidence reasonably supports the characterization," *State v. Novotny*, 9th Dist. Summit No. 26526, 2013-Ohio-2321, ¶ 20, quoting *Akron v. McGuire*, 9th Dist. Summit No. 24638, 2009-Ohio-4661, ¶ 13. Nevertheless, a prosecutor must exercise caution in his or her characterizations so as not to cross the line that separates fair argument from argumentative expressions of personal belief that usurp the role of the jury. *See, e.g., State v. Wright*, 9th Dist. Summit No. 25280, 2010-Ohio-5106, ¶ 27; *Knight*, 2004-Ohio-1227, at ¶ 8-10. "Comments made in closing argument are not viewed in isolation, rather the closing argument is reviewed in its entirety to determine whether remarks by the prosecutor were prejudicial." *State v. Henry*, 9th Dist. Lorain No. 02CA008170, 2003-Ohio-3151, ¶ 28, quoting *State v. Smith*, 9th Dist. Lorain No. 99CA007451, 2001 WL 39604, *1 (Jan. 17, 2001).

{¶38} The record reflects that certain comments the prosecutor made on rebuttal were driven by defense counsel's closing argument. During his closing argument, defense counsel questioned Helen's memory and repeatedly argued that "[s]he was prepped" by the State. He also stated that, given Helen's version of the events, he expected that she would have suffered more physical injuries. Further, defense counsel argued that, had Helen actually been screaming for help, C.S. would have come into the room because she loved Helen. The court sustained the prosecutor's objection when defense counsel stated: "[C.S.] should have moved. That's what I look at when I'm looking at the stories, where are my stories coming from, what do I see as being problematic."

**{¶39}** To the extent that the prosecutor made improper comments during closing argument, Litten has not shown that the prosecutor's misconduct prejudiced him. Litten repeatedly admitted during his testimony both that he had lied to Detective Garro and that he had instructed C.S. to lie after she had initially told the truth. Even if the characterizations the prosecutor employed to portray Litten as untruthful were improper, the record supports the conclusion that Litten did, in fact, lie. *See State v. Hashman*, 9th Dist. Lorain No. 06CA008990, 2007-Ohio-5603, ¶ 18 ("While personal opinions of guilt which are based upon the evidence are not encouraged, they are not deemed to be prejudicially erroneous."). The record also reflects that the trial court instructed the jury that closing arguments "are designed to assist you, but [] are not evidence." *See Lollis*, 2010-Ohio-4457, at ¶ 24. The evidence that was presented at trial consisted not only of Helen's testimony naming Litten as the perpetrator, but also of the significant results of her sexual assault exam and DNA evidence linking Litten to the crime. Litten has not shown that, absent any misconduct on the part of the prosecutor during rebuttal, the jury would not have convicted him. As such, Litten's second assignment of error is overruled.

Assignment of Error Number Three

JOSEPH LITTEN WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED UNDER THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

**{¶40}** In his third assignment of error, Litten argues that he did not receive effective assistance of counsel. We disagree.

**{¶41}** To prove an ineffective assistance claim, Litten must show two things: (1) that counsel's performance was deficient to the extent that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that "the deficient

performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate prejudice, Litten must prove that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland* at 691. Furthermore, this Court need not address both *Strickland* prongs if an appellant fails to prove either one. *State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10.

{¶42} Litten argues that his trial counsel's performance was deficient because he: (1) failed to object to inadmissible character evidence when Helen testified; (2) failed to object when Detective Garro testified that the statement Helen gave to a patrol officer was consistent with the one she gave to Detective Garro; (3) failed to object when a juror supplied Detective Garro with a word during his testimony; (4) failed to make a compelling Crim.R. 29 motion; (5) began his closing argument by "demonstrating his own belief in [Litten's] guilt"; and (6) failed to object to multiple instances of prosecutorial misconduct in closing argument. Having reviewed the record, we do not agree that Litten has demonstrated ineffective assistance of counsel.

{¶43} In Litten's previous assignments of error, this Court addressed the issue of the juror who supplied Detective Garro with a word during his testimony as well as the issue of prosecutorial misconduct as a result of the remarks the prosecutor made on rebuttal in closing argument. We determined that Litten failed to demonstrate prejudice as a result of either issue. Because a successful ineffective assistance claim also requires a demonstration of prejudice, Litten cannot prevail on his claim with regard to these issues. *See Bradley*, 42 Ohio St.3d at paragraph three of the syllabus. Likewise, he cannot prevail on his claim that his counsel was

ineffective for failing to make a compelling Crim.R. 29 motion. "[A] Crim.R. 29 motion is not necessary to preserve the issue of sufficiency for appeal." *State v. Good*, 9th Dist. Wayne Nos. 10CA0056 & 10CA0057, 2011-Ohio-5077, ¶ 26. Furthermore, in his brief, Litten "concedes that there was sufficient evidence" to convict him at trial. Litten cannot show that he was prejudiced by his counsel's Crim.R. 29 argument.

{¶44} To the extent Litten argues that his counsel failed to object to (1) inadmissible character evidence during Helen's testimony, and (2) Detective Garro's assertion that Helen gave consistent statements to the police, we cannot conclude that Litten has demonstrated ineffective assistance of counsel. Detective Garro testified that, before he spoke with Helen, the patrol officer first on the scene spoke with her. When the prosecutor asked Detective Garro if he had reviewed the patrol officer's information, he testified that "[w]hat [Helen] had told the patrol officer and what she told [Detective Garro] were consistent." He did not elaborate any further, but Litten claims that his testimony was hearsay and bolstered Helen's credibility. Detective Garro did not, however, tell the jury what Helen said to the patrol officer. Moreover, his testimony was not that Helen was truthful, just consistent. Given the limited nature of Detective Garro's response, it is unclear how Litten was prejudiced by it. We must conclude, therefore, that Litten has not established his ineffective assistance claim with regard to his counsel's failure to object to Detective Garro's statement. Likewise, we must conclude that Litten has not established his ineffective assistance claim with regard to Helen's testimony.

{¶45} During the State's direct examination of Helen, the following exchange took place:

[PROSECUTOR:] Okay. Before all this, okay, did you get along okay with [Litten]? Did you two get along okay?

[HELEN:] Well, he always came over our house, but when he come over he always liked to talk about young girls and old ladies –

[PROSECUTOR:] Okay.

[HELEN:] – sexually.

After unsuccessfully attempting to interrupt Helen's answer, the prosecutor immediately moved on to a different subject area.

{¶46} "[The] failure to make objections is within the realm of trial tactics and does not establish ineffective assistance of counsel." *State v. Taylor*, 9th Dist. Lorain No. 10CA007945, 2002-Ohio-6992, ¶ 76. We conclude that defense counsel "may well have chosen to let [the foregoing exchange] pass quietly rather than draw attention to it by raising an objection." *State v. Blanch*, 9th Dist. Summit No. 18780, 1998 WL 597658, *4 (Sept. 2, 1998). The prosecutor moved on directly after Helen answered, and Helen's answer was never mentioned again at trial. Litten has not shown that his counsel's failure to object was not, in fact, a strategic decision. *See State v. Bradford*, 9th Dist. Summit No. 22441, 2005-Ohio-5804, ¶ 27-29. Thus, his ineffective assistance claim must fail.

{¶47} Finally, we cannot agree that Litten's counsel was ineffective because he began his closing argument by "demonstrating his own belief in [Litten's] guilt." Defense counsel began his closing argument by describing to the jury how he perceived Litten when Litten initially came to his office seeking representation. Counsel stated that he was worried about defending Litten at first because of his appearance and demeanor. Specifically, counsel stated: "I mean, Joe, you look like a criminal in all aspects. The long hair, the way he speaks." Counsel then went on to explain, however, that when he actually listened to Litten's story, things changed. He argued: "I'm convinced that after you take a look at all the evidence you will not be clearly convinced beyond a reasonable doubt."

{¶48} When read in context, defense counsel's statement sought to convey the point that one cannot judge a book by its cover. The record does not support Litten's assertion that his counsel "validat[ed] [his] guilt." Litten's argument that he received ineffective assistance of counsel lacks merit. Consequently, his third assignment of error is overruled.

Assignment of Error Number Five

THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES UPON JOSEPH LITTEN, IN VIOLATION OF THE DOUBLE JEOPARDY CLAUSE OF [THE] FIFTH AMENDMENT OF THE U.S. CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

{¶49} In his fifth assignment of error, Litten argues that the trial court erred by imposing consecutive sentences upon him as (1) his offenses were allied offenses of similar import, and (2) the court failed to make the required statutory findings before imposing his sentence. We address each argument in turn.

Allied Offenses

{¶50} "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, which prohibits multiple punishments for the same offense." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶ 23. That statute provides as follows:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25. An appellate court applies "a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 28.

{¶51} Two or more offenses may result in multiple convictions if: (1) they are offenses of dissimilar import; (2) they are separately committed; or (3) the defendant possesses a separate animus as to each. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, ¶ 12. The first step of the analysis requires a court to consider the import of the offenses (i.e., whether they are of similar or dissimilar import). *Id.* at ¶ 13. The import analysis entails more than an abstract review of the elements of the offenses involved. *Id.* at ¶ 16, citing *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314. In undertaking the import analysis, "the conduct of the accused must be considered." *Washington* at ¶ 15, quoting *Johnson* at syllabus. *See also Johnson* at ¶ 48 ("[T]he question is whether it is possible to commit one offense *and* commit the other with the same conduct * * *.").

{¶52} The second step of the analysis requires a court to consider whether the offenses at issue "were committed separately or with a separate animus." *Washington* at ¶ 13. *See also Johnson* at ¶ 49 ("If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct * * *."). In applying the second step of the analysis, "a court must review the entire record, including arguments and information presented at the sentencing hearing." *Washington* at ¶ 24. "If the offenses were committed by the same conduct and with a single animus, the offenses merge." *Id.* at ¶ 13.

{¶53} Litten was convicted of rape, pursuant to R.C. 2907.02(A)(2), and kidnapping, pursuant to R.C. 2905.01(A)(4). The subsection of the rape statute under which Litten was convicted provides that "[n]o person shall engage in sexual conduct with another when the

offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). The subsection of the kidnapping statute under which Litten was convicted provides that "[n]o person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity." R.C. 2905.01(A)(4). Both subsections, therefore, are premised upon the intended commission of sexual activity. As previously set forth, the evidence at trial was that Litten led Helen into the family room before forcibly restraining her and sexually assaulting her. Given that scenario, Litten's rape and kidnapping offenses were of similar import, as both offenses could be committed with the same conduct. *See Washington* at ¶ 13-16; *Johnson* at ¶ 48. The only issue is whether the offenses were committed separately or with separate animi. *See Washington* at ¶ 13; *Johnson* at ¶ 49.

{¶54} The State argued below that Litten's offenses were committed separately because his act of drawing Litten into the family room by means of deception was distinct from his conduct in raping her. In the alternative, the State argued that the counts should not merge because Litten's continued restraint of Helen permitted two separate instances of penetration, once while she was standing and once while she was on the ground. The State also argued, however, that Litten, "by means of deception, drew Helen Litten from the kitchen into the living room *to allow him to commit the act of rape*." (Emphasis added.) It also argued that Litten's actions were premeditated, in that he called Helen several times before he came to her house to see if anyone else was home.

{¶55} Since the issuance of *Johnson*, numerous appellate districts have continued to rely on *State v. Logan*, 60 Ohio St.2d 126 (1979), a case in which the Supreme Court outlined several guidelines for determining whether a kidnapping offense should be allied with a related offense.

*See, e.g., State v. Rose*, 12th Dist. Butler No. CA2011-11-214, 2012-Ohio-5607, ¶ 92; *State v. Strong*, 1st Dist. Hamilton Nos. C-100484 & C-100486, 2011-Ohio-4947, ¶ 76; *State v. Gardner*, 7th Dist. Mahoning No. 10 MA 52, 2011-Ohio-2644, ¶ 32-33. In *Logan*, the Supreme Court held:

> In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:
>
> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
>
> (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Logan* at syllabus. We agree with our sister districts that *Logan's* holding remains viable in the wake of *Johnson* and its progeny.

**{¶56}** The record reflects that Litten's attack on Helen amounted to one continuous course of conduct and that he kidnapped her for the sole purpose of raping her. Although Litten led Helen to the family room before raping her, the evidence was that the family room was only a few steps away from the kitchen and that one could hear what was happening in the family room from the kitchen, and vice versa. The kidnapping did not result in an increased risk of harm to Helen and was not prolonged, secretive, or substantial. *See State v. Ramirez*, 12th Dist. Butler No. CA2010-11-305, 2011-Ohio-6531, ¶ 53-59. *Compare Strong* at ¶ 77; *Gardner* at ¶ 30-34. Based on the entire record before us, we must conclude that the kidnapping was, in fact, incidental to the rape. As such, the trial court erred by not merging Litten's convictions for rape and kidnapping.

{¶57} Because the trial court erred by convicting him of allied offenses, Litten's assignment of error is sustained in part. "On remand, the State may elect the offense or offenses upon which it wishes to proceed to sentencing." *State v. Jackson*, 9th Dist. Summit No. 26757, 2013-Ohio-5557, ¶ 30.

<u>Consecutive Sentences</u>

{¶58} Litten also argues that the trial court erred by ordering his sentences to be served consecutively in the absence of certain statutory findings. Because we have determined that the matter must be remanded for the State to elect the offense on which it wishes to proceed to sentencing, Litten's consecutive sentences argument is moot. We, therefore, decline to address that portion of his assignment of error. *See* App.R. 12(A)(1)(c).

Assignment of Error Number Six

THE CUMULATIVE EFFECT OF ERRORS DEPRIVED JOSEPH LITTEN OF A FAIR TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶59} In his sixth assignment of error, Litten argues that cumulative errors in the proceeding deprived him of his right to a fair trial. We disagree.

{¶60} Cumulative error exists only where the errors during trial actually "deprive[d] a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. "[T]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." *State v. Hill*, 75 Ohio St.3d 195, 212 (1996), quoting *United States v. Hasting*, 461 U.S. 499, 508-509 (1983). Moreover, "errors cannot become prejudicial by sheer weight of numbers." *Hill* at 212.

**{¶61}** After reviewing the record, we cannot say that Litten's trial was plagued with numerous errors or that his constitutional right to a fair trial was violated. Therefore, Litten's sixth assignment of error is overruled.

### III

**{¶62}** Litten's fifth assignment of error is sustained, in part. The remainder of his fifth assignment of error is moot, and his other assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed in part, reversed in part, and remanded for further proceedings consistent with the foregoing opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

BETH WHITMORE
FOR THE COURT

HENSAL, J.
<u>CONCURS.</u>

BELFANCE, P. J.
<u>CONCURRING.</u>

**{¶63}** I concur in the majority of the opinion. I write separately with respect to Mr. Litten's second assignment of error to reiterate my disagreement with this Court's precedent that concludes that, under certain circumstances, it is not improper for a prosecutor to call a defendant a liar. *See State v. Novotny,* 9th Dist. Summit No. 26526, 2013-Ohio-2321, ¶ 20. As I noted in my separate opinion in *Novotny,*

> [t]he word 'liar' is pejorative and has very negative connotations; it implies that a person has a reputation for being untruthful that goes beyond the occasional fib. Under the best of circumstances, if a prosecutor told the jury that the defendant is a liar, this would invade the province of the jury given that it would express a personal belief not only as to the credibility of the defendant but also a personal belief about his character.

*Id.* at ¶ 25 (Belfance, P.J., concurring in judgment only). Accordingly, while Mr. Litten did admit to lying, and it would be acceptable for the prosecutor to point that out, I would conclude that it was improper for the State to characterize Mr. Litten as a liar. In addition, while it was improper for the prosecutor to voice his personal opinion of the witnesses' credibility or of Mr. Litten's guilt, I agree that Mr. Litten has not demonstrated prejudice. Accordingly, I concur in the majority's resolution of his second assignment of error.

APPEARANCES:

JEREMY A. VEILLETTE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.