[Cite as *State v. Howard*, 2014-Ohio-3373.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No. 13CA010372 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JOHN P. HOWARD | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 11CR082569 |

DECISION AND JOURNAL ENTRY

Dated: August 4, 2014

WHITMORE, Judge.

{¶1} Appellant, John Howard, appeals from his convictions in the Lorain County Court of Common Pleas. This Court affirms.

I

{¶2} On March 27, 2011, S.L. reported to her mother that she had just been raped by a man in their neighborhood. S.L. then told her mother, for the first time, that the same man had raped her a couple of months prior, sometime in early 2011.

{¶3} According to S.L. she had first met the man, later identified as Howard, when she and her sister were selling candy bars in the neighborhood for the school orchestra. S.L. testified that Howard purchased twelve or twenty candy bars and let them keep the candy. Sometime thereafter, in early 2011, S.L. went to Howard's house to see if he would like to buy some jewelry that she had made. According to S.L., when she knocked on his back door, Howard said his wife might like to purchase some earrings and invited her inside. S.L. testified that, when she

went inside, Howard closed the door, locked it, and told her to take her clothes off. S.L. said she was scared and noticed a black and brown handgun within Howard's reach. S.L. stated that Howard then came over to her and started kissing her, lifted her shirt, and put his hand down her pants. According to S.L., Howard then lifted her bra and sucked on her breasts. He then unbuttoned his pants, pulled his penis out of the hole in his underwear, and forced her to perform oral sex. S.L. said that, after a couple of minutes, Howard pushed her to the ground and vaginally raped her. She stated that about five minutes later, Howard just stopped, got up, and told her to get out. S.L. testified that she got up, put on her clothes, grabbed her earring kit, unlocked the door and left. S.L. said that, as she was leaving, Howard told her not to tell anyone or he would kill her and her family.

{¶4} S.L. testified that the next time she saw Howard was on March 27, 2011. According to S.L., on that day, she had biked down the street to the elementary school to see if the tetherball poles were up. As she was making her way back home, Howard approached her from behind. According to S.L., Howard lifted his shirt, revealing a handgun in his waist, and told her to come with him or he would shoot her. S.L. testified that they went across the street to his house where he raped her again. S.L. said Howard again threatened to kill her and her family if she told anyone. S.L. then biked home and told her mother what had happened.

{¶5} Howard was indicted on four counts of kidnapping, four counts of rape, and two counts of intimidating a victim. These charges stemmed from the allegations that S.L. was raped in early 2011 and on March 27, 2011. After a jury trial, Howard was acquitted of the charges related to the allegation of early 2011. These included: two counts of rape, two counts of kidnapping with sexual motivation specifications, and one count of intimidating a victim. As to the charges related to March 27, 2011, the jury found Howard guilty on the two counts of

kidnapping with attendant specifications, one count of rape with a firearm specification, and one count of intimidating a victim. The jury acquitted him of the remaining rape charge connected to March 27, 2011.

**{¶6}** After merging the second kidnapping count into the first, the court sentenced Howard to: (1) three years for kidnapping, a violation of R.C. 2905.01(A)(2), a felony of the first degree; (2) seven years for rape, a violation of R.C. 2907.02(A)(2), a felony of the first degree; and (3) twelve months for intimidating a victim, a violation of R.C. 2921.04(B), a felony of the third degree. The court ordered the kidnapping, rape, and firearm specification to all be served consecutively, for an aggregate prison term of 13 years. Howard now appeals and raises three assignments of error for our review. To facilitate the analysis, we rearrange his assignments of error.

II

Assignment of Error Number Two

THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE OF GUILT AND THEREFORE IT WAS ERROR FOR DEFENDANT TO HAVE BEEN FOUND GUILTY BEYOND A REASONABLE DOUBT AS TO EVERY ELEMENT OF RAPE, KIDNAPPING, AND INTIMIDATION OF AN ATTORNEY, VICTIM OR WITNESS[.]

**{¶7}** In his second assignment of error, Howard argues that his convictions are not supported by sufficient evidence. We disagree.

**{¶8}** "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386. When reviewing a conviction for sufficiency, evidence must be

viewed in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The pertinent question is whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶9} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955). This Court, therefore, reviews questions of sufficiency de novo. *State v. Salupo*, 177 Ohio App.3d 354, 2008-Ohio-3721, ¶ 4 (9th Dist.).

{¶10} R.C. 2905.01, in relevant part, states that "[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o facilitate the commission of any felony * * * [or] * * * [t]o engage in sexual activity * * * with the victim against the victim's will[.]" Any person that violates this statute is guilty of kidnapping. R.C. 2905.01(C)(1).

{¶11} R.C. 2907.02(A)(2) states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Whoever violates this section is guilty of rape. R.C. 2907.02(B).

{¶12} R.C. 2921.04(B)(1) provides that "[n]o person, knowingly and * * * by unlawful threat of harm to any person * * * shall attempt to influence, intimidate, or hinder * * * [t]he victim of a crime * * * in the filing or prosecution of criminal charges * * *[.]" "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶13} Howard argues that the evidence is insufficient to support his convictions because the State did not present any evidence to corroborate S.L.'s allegations. Specifically, Howard

argues, there was no witness that testified to her kidnapping, which occurred during daylight hours, and Howard's testimony "rebutted S.L.'s testimony."

{¶14} S.L. testified that on March 27, 2011, at approximately 4:45 p.m., she went across the street to her friend's house to play. After a short conversation with her friend, the two decided that S.L. would ride her bike down the street to the elementary school to see if the tetherball poles were up while the friend finished some household chores. S.L. testified that she rode her bike south[1] on Prospect Street to the school and saw that the tetherball poles were not up. She then exited the south-west side of the playground and travelled east on Elm Street toward Prospect to head back home. S.L. said that, as she was walking her bike approaching the intersection of Elm and Prospect, she heard something and turned around. According to S.L., when she turned around she saw Howard. S.L. testified that he lifted his shirt, revealing a black and brown gun in his waist band, and told her to come with him or he would shoot her.

{¶15} S.L. testified that she recognized Howard immediately from the prior encounter and was too afraid to run away because she was worried he would shoot her. Howard then followed S.L. to his house, at the south-east corner of Elm and Prospect. S.L. said that, when they reached the back door to his house, Howard opened the door and "kind of pushed [her] inside." According to S.L., Howard then closed the door, placed his gun on the kitchen counter, and drank a can of beer. S.L. stated that Howard offered her beer, but she declined. He then approached her and started kissing her on the mouth and touching her breasts. S.L. testified that Howard then kissed her neck, lifted her shirt and bra, and kissed and sucked her breasts. Howard

---

[1] S.L. did not testify to the cardinal direction she travelled and the exhibits admitted do not contain a compass. For ease of discussion, we assume the maps admitted are oriented with North at the top of the page and use that orientation throughout our discussion.

then put his hand down the back of her pants and squeezed her buttocks. S.L. said she kept telling Howard that she had to leave, but he kept saying that she was not going anywhere.

{¶16} S.L. testified that Howard then pushed her into the adjoining dining room, where she saw "bullets and guns and papers." Howard pushed her down on her knees, pulled down his pants, and pulled his penis out through the hole in his underwear. S.L. said that he then put his penis in her mouth. According to S.L., Howard began moving back and forth and grunting while his penis was in her mouth. S.L. estimated that this lasted two or three minutes. According to S.L., Howard then pulled his penis out of her mouth, pushed her to the ground, and pulled her pants down until they were below her knees. Howard pulled his pants down a little lower, got down on his knee and penetrated her vagina with his penis. S.L. testified that his penis did not go very far inside of her because she told him she had to leave or her mother would be coming to look for her. S.L. said Howard then stood up and told her to go, but that she had to come back the following day at 1:30 to help him clean. S.L. stated that as she was leaving Howard told her not to tell anyone or he would shoot her and her family. S.L. testified that she rode her bike home and told her mother that she had been raped.

{¶17} S.L.'s mother called the police and Officer Melissa Lett, of the Oberlin Police Department, responded. After a lengthy interview, S.L. got into Officer Lett's patrol car and directed her to Howard's house. S.L. later identified Howard in a photo line-up as the man that had raped her.

{¶18} S.L.'s testimony, if believed, provides sufficient evidence to support a conviction of rape, kidnapping, and intimidation of a victim. *See* R.C. 2905.01(A)(2), (4); R.C. 2907.02(A)(2); and R.C. 2921.04(B)(1). A victim's testimony does not need to be corroborated. *See State v. Melendez*, 9th Dist. Lorain No. 08CA009477, 2009-Ohio-4425, ¶ 30. Viewing the

evidence in a light most favorable to the State, there is sufficient evidence to support Howard's convictions. Howard's second assignment of error is overruled.

### Assignment of Error Number Three

THE VERDICT OF GUILTY AS TO RAPE, KIDNAPPING, AND INTIMIDATION OF AN ATTORNEY, VICTIM OR WITNESS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

{¶19} In his third assignment of error, Howard argues that his convictions are against the manifest weight of the evidence. We disagree.

{¶20} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *Id.* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶21} The State presented eight witnesses: S.L. and her mother, three police officers, a sexual assault nurse examiner, and two forensic scientists from Ohio's Bureau of Identification and Investigation ("BCI").

**Melody Wright**

{¶22} Melody Wright, S.L.'s mother, testified that she and her husband have five children, four of them adopted. S.L. is the youngest. Wright explained that S.L. had been removed from her biological family when she was 18 months old and spent a brief time living with a family member. S.L. was then transferred to a foster home, and subsequently adopted by Wright and her husband when S.L. was four years old. Wright testified to S.L.'s emotional difficulties, which Wright attributed to S.L.'s difficult start in life. Wright stated that S.L. had been diagnosed with post-traumatic stress disorder and reactive attachment disorder and was regularly seeing a therapist. Wright said that most of S.L.'s medical diagnoses were related to her panic attacks and that she took medication regularly to address her mental health issues. Wright denied that S.L.'s prescription drugs affected her ability to communicate, understand, or view reality.

{¶23} Wright testified that on March 27, 2011, S.L. had gone to a friend's house for a barbeque and had returned home at approximately 4:30 p.m. Unbeknownst to Wright at the time, S.L. received permission from her father to go across the street to another friend's house to play. Wright said she was in the bathroom when she heard the front door slam and S.L. scream for her. According to Wright, S.L. was crying and could not catch her breath. S.L. eventually told Wright that she had been raped. Wright called S.L.'s therapist and asked her what to do. Wright then called the police. While waiting for the police, S.L. asked Wright if she could brush

her teeth, take a shower, and change her clothes. Wright told her that she would have to wait until she spoke to the police.

{¶24} Wright testified that Officer Melissa Lett arrived at the house shortly after Wright's call. Wright stated that Officer Lett interviewed S.L. in the living room. She said S.L. had calmed down a little bit, but was still crying and in shock. S.L. was sitting in a chair holding a stuffed animal. Wright said she did not remember much about the interview except that S.L. was afraid and upset. After the interview, Wright and S.L. got into the back of Officer Lett's patrol car and S.L. directed Officer Lett to Howard's home. Wright then took S.L. to a local medical center for a rape examination.

**Officer Melissa Lett**

{¶25} Officer Lett testified that she responded to Wright's call at approximately 5:45 p.m. According to Officer Lett, S.L. was sitting in a chair hugging a pillow and would sometimes have her head in the pillow when she was speaking. It took Officer Lett some time to build a rapport with S.L. before she began telling Officer Lett what had happened. Officer Lett estimated that she spent three hours with S.L. She described the interview with S.L. as a very difficult one because S.L. was crying, breathing heavy, withdrawn, and very soft spoken.

{¶26} Officer Lett recapped what S.L. had told her had happened. According to Officer Lett, S.L. said she had ridden her bike to the local elementary school to see if the tetherball poles were up. As S.L. was making her way home, Howard stopped her, lifted his shirt, and showed her a black handgun sticking out of his pants. S.L. told her that Howard's gun was similar to her service weapon, a Glock semi-automatic pistol. S.L. told Officer Lett that he placed his hand on his gun and told her to come with him or he would shoot her. S.L. said that she then followed Howard to his house, they entered the back door, and Howard closed and locked the door behind

them. Officer Lett testified that S.L. then told her that Howard walked over and put his gun down on the kitchen counter by a stool, drank some beer and offered her some, which she declined. Officer Lett said S.L. told her that Howard then approached her and started kissing her on the lips and neck. Howard began lifting S.L.'s shirt and she kept telling him she had to leave, but he did not listen. Officer Lett stated that S.L. told her that Howard had lifted her shirt and bra and started touching her breast and "put his mouth" on her.

{¶27} Officer Lett indicated that S.L. told her that Howard then sat back down on the kitchen stool and pulled his penis out through the hole in his underwear and put it in her mouth. S.L. could not remember exactly what type of pants Howard was wearing but told Officer Lett that they were dark, possibly blue, and were similar to Officer Lett's uniform pants. S.L. told Officer Lett that Howard had on grey underwear. According to Officer Lett's report, S.L. then told her that Howard moved her into the dining room, pulled down her pants and underwear, and put her on the dining room table where "he put his thing in her thing." S.L. then told Officer Lett that Howard told her she was "tight." Officer Lett stated that S.L. told him that he was hurting her and that she had to go because her mom would be coming to look for her. Howard then stopped and let her go, but told her that she needed to return the following day at 1:30 to help him clean and that if she told anyone he would shoot her or kill her family.

{¶28} Officer Lett acknowledged that she wrote in her report that S.L. told her that the vaginal rape occurred on the dining room table, but said it was entirely possible that S.L. said the rape happened near, and not on, the table. Officer Lett testified that S.L. was difficult to understand at points in the interview because she had her head in a pillow and was very soft spoken. Additionally, there were long periods of silence during the interview during which S.L.

would put her head in her pillow and cry. Officer Lett testified that she only interviewed S.L. the one time and ended the interview when she felt that she had enough information.

{¶29} S.L. described the inside of Howard's home to Officer Lett and the vehicles in the driveway. She told Officer Lett that there were "a lot of guns" in the house and an old pinball machine. Officer Lett testified that S.L. and Wright got into the back of her cruiser and S.L. directed Officer Lett to Howard's house. Officer Lett said S.L. appeared to be "very scared" and "ducked down" to hide as they passed Howard's house. Officer Lett then told Wright to take S.L. to a local medical center for a rape examination.

**Nurse Sheri Sycz**

{¶30} Sheri Sycz is a sexual assault nurse examiner at the Nord Center. Sycz testified that she began her examination of S.L. at approximately 10:30 p.m. According to Sycz, the examination took longer than normal because it was very hard to get S.L. to talk. Sycz described S.L. as "disheveled," "anxious," and "afraid." Sycz said S.L. told her she was afraid that Howard would kill her and her family. Sycz tried to reassure her that she was safe and spent some time building a rapport with S.L. before she eventually opened up about what had happened. According to Sycz, her report included direct quotes of S.L.'s statements, but that S.L. did not describe the events in chronological order. Instead, her statements were "kind of scrambled around," which, according to Sycz, is normal for a victim.

{¶31} According to Sycz's report, S.L. told her that she was "walking in the neighborhood" when Howard came outside and "pulled his shirt up and showed [her] his gun." He told her to come inside. When she went inside he locked the door and told her to sit down. He then kissed her on her neck and told her to get on her knees. S.L. kept telling him she had to go home, but he ignored her. Howard then told her he wanted to see her breasts and pulled up

her shirt and sucked on them. He then pulled her pants and underwear down and put his "thing" in her. She told him that she had to leave or her mother would come looking for her. He then said okay and let her go, but told her if she told he would kill her and her family. He also told her she had to come back the following day at 1:30. Sycz's report stated that S.L. said he was "obviously drunk" and that she did not think he wanted to hurt her. S.L. told Sycz that after a prior incident, Howard had told her that he loved her and that he would marry her, and when she told him that she was only 13 years old, he said "even better."

{¶32} Sycz testified that S.L. did not have any obvious physical injuries, but that she has never seen injuries in a child from rape because children usually do not fight. Sycz did note that S.L. had redness on the inner part of her vaginal area, which indicated "rigorous friction." Sycz's admitted that redness of the labia minora could be explained by reasons other than sexual intercourse, such as riding a bike. However, Sycz explained that in those instances you would expect to also see redness on the outside of the vagina too. S.L. did not have any redness on the outside of her vagina.

**Officer William Flesch**

{¶33} Officer William Flesch of the Oberlin Police Department executed an arrest warrant for Howard on March 29, 2011. Officer Flesch testified that he waited until Howard left his home and then radioed for uniformed officers to assist. According to Officer Flesch, it was a routine felony stop in which several officers arrested Howard with their guns drawn. Howard was taken into custody without incident.

{¶34} Approximately 15 minutes after being arrested, Officer Flesch gave Howard his Miranda warnings and conducted an interview. In the interview, Howard asked if this was about the girl that was at his house a couple of days prior. Howard admitted to Officer Flesch that S.L.

was at his house on March 27th. He said that he had met her about a year before when she had cleaned his house, but had not seen her since, until she appeared at his door on March 27th. Howard told Officer Flesch that S.L. appeared at his door on March 27th and asked if he had any work for her because she needed money for school. When he said yes, she started kissing him. Howard told S.L. that they could not do that, but said he did not ask her to leave because he did not think it was a big deal. He then walked over and sat on the kitchen stool. S.L. then approached him and kissed him again. Howard said that he again told her no. Howard told Officer Flesch that there was no sexual contact, and that his mouth did not touch any other part of her body.

**Sergeant Victor Ortiz**

**{¶35}** Sergeant Victor Ortiz with the Oberlin Police Department executed the search warrant of Howard's home on March 29, 2011. Sergeant Ortiz described Howard's home as "a little messy" with a lot of guns and clothes lying around. Sergeant Ortiz testified that he found a loaded Makarov semi-automatic handgun on the kitchen counter next to a stool. Sergeant Ortiz also recovered a BB gun from the dining room, and four handguns from the living room. Also in the living room was a cabinet with ammunition and an old pinball machine.

**{¶36}** In addition to the guns, Sergeant Ortiz confiscated the glass top to Howard's dining room table because he was told that the rape occurred on the table by either Officer Lett or Flesch. Sergeant Ortiz also collected a pair of underwear from the dining room and a pair of pants and underwear from in front of the washer and dryer, located just off of the kitchen.

**Forensic Evidence**

**{¶37}** Jennifer LaCava, a forensic scientist in the biology and DNA section of BCI, testified that she conducted an analysis of S.L.'s rape kit. LaCava testified that no semen was

identified in the samples, but that result did not necessarily mean that no contact occurred. LaCava did identify amylase on the skin swabs from S.L.'s neck and breasts. She explained that amylase is a component of saliva, but is also found in other bodily fluids, such as mucus. LaCava testified that it is possible for a person to have amylase on his or her hand by coughing into it. LaCava said that it is further possible for a person to transfer that amylase from his or her hand by touch. The amylase test, according to LaCava, is just a screening tool that is used to identify samples to be forwarded on for DNA testing.

{¶38} LaCava also tested certain articles of clothes that were submitted by BCI. She tested S.L.'s bra, tank top, and sweater for semen, but no semen was found. LaCava tested S.L.'s bra and the two pairs of Howard's underwear for amylase. LaCava stated that amylase was identified on both sides of S.L.'s bra and on the interior panel of one pair of Howard's underwear. LaCava said she then passed those items on for DNA testing.

{¶39} Stacy Violi, a forensic scientist at BCI, conducted the DNA testing. Violi conducted DNA testing on swabs taken as part of S.L.'s rape kit. Violi tested swabs taken from S.L.'s underwear, swabs from her breasts, and swabs from her neck. Only S.L.'s DNA was found on the swabs of her underwear and her breasts. Violi did identify a partial profile on the swab of S.L.'s neck, but was unable to draw any conclusion from that profile because the amount of DNA obtained was insufficient for comparison.

{¶40} Violi then tested S.L's bra and two pairs of Howard's underwear. As to the bra, Violi testified that DNA consistent with S.L. and Howard was found on the interior of S.L.'s bra. DNA consistent with S.L., Howard, and an unknown individual was found on the exterior of the bra. Violi explained that "[b]ased on the national database provided by the Federal Bureau of Investigation, the expected frequency of occurrence of the DNA profile not attributed to [S.L.]

on the swab from the interior of the bra cups * * * is 1 in 2,795,000,000,000,000,000 unrelated individuals." Violi further testified that the population of the Earth is approximately 7,000,000,000.

{¶41} Violi testified that she also found DNA on the two pairs of Howard's underwear. One pair contained DNA of Howard and an unknown individual. The other pair, contained DNA profiles consistent with Howard, S.L., and an unknown individual on the exterior front panel. Violi explained that "[b]ased on the national database provided by the Federal Bureau of Investigation, the proportion of the population that cannot be excluded as possible contributors to the mixture of DNA profiles on the swab from the exterior front panel of John Howard's underwear * * * is 1 in 16,720 unrelated individuals." Violi testified that the reason this statistic reflects a more common DNA profile is because the DNA found contained a mixture of different profiles. "When you have a mixture of DNA * * * you have to account for all of the DNA that's there and any kind of combination. So it makes the profile more common."

{¶42} Violi testified that DNA can be transferred by touch, but that the further the degree of transfer the less likely there is to be a detectable amount of DNA. For example, if DNA is transferred to another by kissing, then that person put his finger in his mouth, and then he touches something, it is possible that he would transfer the DNA of the person that kissed him. However, because it is a third degree transfer, it is not as likely to result in a detectable amount of DNA as would a direct transfer. Violi did state that it was possible to transfer amylase (which contains DNA) from a woman's breast to the interior of her bra and that a source of DNA that is wet is more likely to transfer by touch than a source that is dry. Violi also testified that it is extremely unlikely to detect foreign skin cells left in a rape victim's mouth or

vagina with the type of testing that BCI performs. Therefore, unless semen is found, DNA testing is not performed on samples taken from a victim's mouth or vagina.

{¶43} LaCava testified that the Oberlin Police Department attempted to submit a large amount of evidence, some twenty or thirty items, for testing. However, BCI policy is to accept the "best items first." According to LaCava, BCI typically accepts five items or less initially, but will accept later submissions if necessary.

**Dr. Pilar Lachhwani**

{¶44} The defense presented two witnesses, Dr. Pilar Lachhwani and Howard.

{¶45} Dr. Pilar Lachhwani is a child psychiatrist with Applewood Centers. As part of Dr. Lachhwani's duties she does psychiatric evaluations and pharmacological management of patients. Dr. Lachhwani testified that she reviewed S.L.'s file and met with S.L. for thirty minutes to manage her prescription drugs. Dr. Lachhwani did not diagnose S.L. with any of the conditions noted in her file. Dr. Lachhwani did testify to S.L.'s various diagnoses and generally described each diagnosis. According to Dr. Lachhwani, S.L. was diagnosed with: Bipolar II, severe with psychotic features; Post-Traumatic Stress Disorder ("PTSD"); Reactive Attachment Disorder ("RAD"); Oppositional Defiant Disorder ("ODD"); Impulse Control Disorder ("ICD"); and Atypical Pervasive Development ("APD").

{¶46} Dr. Lachhwani explained that a Bipolar II disorder, severe with psychotic features diagnosis, "means that the person ha[s] discrete periods of depression sometimes, sometimes with hypomanic or manic episodes, and during those times she exhibited at some point psychoses, which means having visual or auditory hallucinations[.]" A person suffering from PTSD has symptoms "in which they experience in any thoughts, in any images, in any scene, or anyplace, recollections of [a] trauma." RAD "is a disorder in which a child shows since early

infancy social difficulties." Specifically, the child has difficulty developing a sense of attachment to his or her caregiver. Dr. Lachhwani testified that RAD is frequently seen in foster children because foster children often have repeated changes in their caregivers. ODD is a disorder where the person is "at times not compliant with the rules, mainly at home or the school." ICD is related to "outbursts, aggressive rages that people may have intermittently with no apparent triggers, or many times too much to what the reason was for that rage." APD is a diagnosis when someone is "a little bit social awkward." Where a person "lack[s] the judgment to really read social clues."

{¶47} Dr. Lachhwani testified that S.L.'s RAD and ICD diagnoses dated back to 2007 and 2008, respectively. These diagnoses, therefore, pre-dated the rape on March 27, 2011. As to the RAD diagnosis, Wright, S.L.'s adoptive mother, testified that she was aware of this diagnosis prior to S.L.'s adoption and that it was related to her rough start in life. S.L. was removed from her biological parents at 18 months and spent a brief time living with other family members before being transferred to foster care. S.L. was eventually adopted by Wright and her husband at the age of four. Dr. Lachhwani explained that RAD is diagnosed when a child has difficultly developing attachment to his or her caregiver and is common in foster children.

{¶48} Wright testified that she was not aware of S.L.'s ICD diagnosis, but that she was aware of S.L.'s mental issues and that S.L. was involved in intensive therapy. Wright explained that most of S.L.'s issues were related to her "panic attacks." According to Wright, S.L. would "just kind of shut down." S.L. testified that she was currently attending the Positive Education Program, a school for children with special needs. S.L. stated that she was enrolled in the school because of behavioral problems. S.L. explained that she sometimes gets angry and out of control.

{¶49} Dr. Lachhwani testified that S.L. was diagnosed with PTSD and ODD on March 29, 2011, and with bipolar on April 17, 2012. These diagnoses, therefore, post-date the rape on March 27, 2011. Dr. Lachhwani did testify that a traumatic event, such as rape, could result in PTSD. Wright testified that she was aware that S.L. had been previously diagnosed with PTSD when she was younger, and that they had "dealt with that." As to the bipolar diagnosis, Wright said she was unaware of the diagnosis but did acknowledge that, in 2012, S.L. had heard voices telling her to hurt herself and had she had been hospitalized multiple times. Again, this diagnosis occurred after the rape on March 27, 2011.

**John Howard**

{¶50} Howard also testified in his defense. Howard said that he met S.L. in April or May of 2010 when she approached him outside of his house selling candy bars for school. Howard bought two candy bars for five dollars and told her to keep the candy and sell it to someone else. According to Howard, S.L. then asked if he had any work she could do for money. He told her that he would pay her to do some housework, and S.L. told him she would be back the following day. Howard said S.L. did return the following day, while he was out doing yard work. He took her inside the house, showed her the kitchen, dining room, foyer, and living room. He showed her how to work the vacuum and how to dust the furniture. Howard said he then went back outside to finish the yard work while she cleaned. He came back inside approximately 30 to 45 minutes later and looked around. He testified that she did a good job so he thanked her, paid her seven dollars, and she left.

{¶51} Howard said the next time he saw S.L. was on March 27, 2011, when she came to his door. According to Howard, he was in the process of cleaning out his refrigerator when he heard a knock at the back door. He turned, saw S.L., and went to let her inside. He asked her

how she'd been and she said she was okay but needed twenty-five dollars for school. Howard said S.L. then grabbed him and kissed him, putting her tongue in his mouth. Howard explained that he pulled back and said she could not do that. He then walked around the kitchen counter and sat on a stool. According to Howard, S.L. again talked about needing money for school. She then put her fingers in her mouth, picked up her sweater, and made a circular motion with her hand underneath her sweater while walking toward him. Howard testified that S.L. walked up between his legs, stuck her hand in the waistband of his pants, grabbed his arm with her other hand and pulled him toward her, and kissed him again. Howard said he jumped up from the stool and told her that she could not do that. He became upset and started coughing and spitting up phlegm into his hand because of his emphysema. Howard then went to the bathroom, leaving S.L. alone in the kitchen.

{¶52} In the bathroom, Howard said he pulled down his pants a bit and pulled his penis out through the hole in his underwear to urinate. He did not wash his hands before or after using the restroom. Howard explained that the only way his DNA could have been on S.L.'s bra was from when she kissed him, put her fingers in her mouth, and then rubbed her breasts. Howard explained that S.L.'s DNA on his underwear must have been from her transferring DNA into his mouth by kissing, then him coughing phlegm into his hand, then him touching himself when he used the restroom.

{¶53} Howard testified that S.L. was still in the kitchen by the stool when he returned. S.L. offered to return the following day to clean, but Howard said he told her that was not a good idea and asked her to leave. Howard said S.L. then left, riding her bike. At some point after S.L. left, Howard noticed twenty dollars was missing from his kitchen counter. According to Howard, he had sat at the kitchen counter and counted a stack of money earlier that day. He said

he had $347 and made out a deposit slip for $327 because he wanted to keep $20. At some point after S.L. left, Howard recounted the stack of money and only had $327. Howard admitted that it was possible that one of the tenants from upstairs could have taken the money from the counter when he was not in the kitchen. The police found $327 on Howard when he was arrested.

{¶54} Howard admitted that he left many details out of his statement to Officer Flesch, including that S.L. had put her fingers in her mouth and rubbed her breasts, and that he was missing twenty dollars. Howard said he was confused during the interview because he did not know what was going on. He did not know what the charges were against him and had been warned that his statements might be used against him. Howard described himself as a seventy-year-old man with numerous health problems. He said he has COPD and severe emphysema. He has had open heart surgery, three back surgeries, and three abdominal surgeries. Despite these health problems, Howard testified that he is able to move around and, in April or May 2010, was able to perform yard work.

{¶55} Howard testified that he lawfully owns the guns that were found in his home. He said that he always keeps the Makarov in one of two places in the kitchen. The other guns are sometimes kept on the coffee table in the living room. He explained that he always keeps his guns loaded otherwise he saw no sense in owning them. Howard admitted that it was unwise to leave S.L., a girl he did not know, in his home alone with loaded firearms to clean his house in 2010 and when he went to use the restroom on March 27, 2011.

**Conclusion**

{¶56} Howard argues that his convictions are against the manifest weight of the evidence, in essence, because S.L. is not credible. Howard cites to minor differences in S.L.'s trial testimony with the testimony of various witnesses relaying what S.L. had told them on

March 27, 2011. Howard further argues that S.L.'s testimony is not credible because it makes no sense that S.L. would take the long way home from the playground on March 27, 2011, which would have taken her by his house; a house in which she was allegedly attacked in months prior.

**{¶57}** In reaching its verdict, the jury chose to believe S.L., at least in part, over Howard. "[T]his Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge only because the trier of fact chose to believe certain witnesses' testimony over the testimony of others." *State v. Manso*, 9th Dist. Summit No. 26727, 2014-Ohio-1388, ¶ 26, quoting *State v. Brown*, 9th Dist. Wayne No. 11CA0054, 2013-Ohio-2945, ¶ 42. The jury is in the best position to "view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Peterson*, 9th Dist. Summit No. 25592, 2012-Ohio-250, ¶ 31, quoting *State v. Cook*, 9th Dist. Summit No. 21185, 2003-Ohio-727, ¶ 30. "Additionally, in reaching its verdict, the jury is free to believe all, part, or none of the testimony of each witness." *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35.

**{¶58}** After a review of the record, we cannot conclude that this is the exceptional case where the jury clearly lost its way and created a manifest miscarriage of justice. *See Otten*, 33 Ohio App.3d at 340. Howard's third assignment of error is overruled.

Assignment of Error Number One

> THE TRIAL COURT COMMITTED PLAIN AND REVERSIBLE ERROR WHEN IT FAILED TO FIND RAPE IN VIOLATION OF R.C. 2907.02(A)(2) AND KIDNAPPING IN VIOLATION OF R.C. 2905.01(A)(2) and 2905.01(A)(4) ARE ALLIED OFFENSES OF SIMILAR IMPORT AND ARE ONE CONVICTION FOR PURPOSES OF SENTENCING AND MERGE FOR PURPOSES OF SENTENCING[.]

{¶59} In his first assignment of error, Howard argues that his convictions for rape and kidnapping are allied offenses of similar import, and therefore, the court committed plain error by sentencing him on both counts.

{¶60} "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, which prohibits multiple punishments for the same offense." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶ 23. R.C. 2941.25 provides as follows:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

Thus, "[t]wo or more offenses may result in multiple convictions if: (1) they are offenses of dissimilar import; (2) they are separately committed; or (3) the defendant possesses a separate animus as to each." *State v. Litten*, 9th Dist. Summit No. 26812, 2014-Ohio-577, ¶ 51. An appellate court applies a de novo standard of review when determining whether offenses merge pursuant to R.C. 2941.25. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 12.

{¶61} A plurality of the Ohio Supreme Court set forth a two-part test to analyze whether two offenses are allied offenses of similar import. *See State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, ¶ 47-50. First, the court must determine "whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other." (Emphasis sic.) *Id*. at ¶ 48. Second, "[i]f the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were

committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id*. at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 50 (Lanzinger, J., dissenting). If the answer is yes, the offenses will merge. *Johnson* at ¶ 50.

**{¶62}** Howard was convicted of: (1) rape, in violation of R.C. 2907.02(A)(2); (2) kidnapping, in violation of R.C. 2905.01(A)(2), and (3) kidnapping, in violation of R.C. 2905.01(A)(4). The court found that the two kidnapping counts were allied offenses and the State elected to have Howard sentenced on R.C. 2905.01(A)(2).

**{¶63}** R.C. 2907.02(A)(2) states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2905.01(A)(2), in relevant part, states that "[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or retrain the liberty of the other person * * * [t]o facilitate the commission of any felony * * * ."

**{¶64}** It has been well recognized that kidnapping is implicit in every forcible rape. *See State v. Logan*, 60 Ohio St.2d 126, 130 (1979). *See also State v. Anderson*, 9th Dist. Summit No. 26640, 2014-Ohio-1206, ¶ 7-8. "Therefore, the crucial inquiry in this case is whether [Howard] committed kidnapping and rape separately or with a separate animus so that the two offenses would not merge." *Anderson* at ¶ 8. In *Logan*, the Ohio Supreme Court set forth a test to determine whether kidnapping and rape were committed with a separate animus.

> (a) [W]here the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
>
> (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Logan* at syllabus.

{¶65} S.L. testified that she was walking her bike approaching the north-west corner of Elm and Prospect when she turned around and saw Howard. According to S.L., Howard lifted his shirt, revealing a handgun tucked into the waist of his pants, and told her to come with him or he would shoot her. He then walked her to his house at the south-east corner of Elm and Prospect. S.L. testified that she went with Howard because she believed he would shoot her. S.L. said he opened the back door and "kind of pushed [her] inside." He then closed the door, walked across the kitchen and put his gun on the counter, and began drinking a beer. After drinking some beer, Howard approached S.L., who was still standing near the door, and began kissing her. S.L. testified that Howard then moved her into the dining room where he forced her to perform oral sex and vaginally raped her.

{¶66} Under the circumstances of this case, we conclude that Howard committed kidnapping and rape separately or with a separate animus. Howard accosted S.L. on the public street and demanded that she go with him or he would shoot her. Howard took her to the privacy of his home, where no one else was present. Secret confinement may signify a separate animus. *Logan* at 135. *See also State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, ¶ 135 ("restraint was secretive, as it took place inside [defendant's] apartment."). He then proceeded to sit in the kitchen and drink beer; at this point in time the act of kidnapping was complete. *See Anderson*, 2014-Ohio-1206, ¶ 14 (kidnapping complete when defendant deceived victim into believing he would drive her to church and before he drove her to a secluded location and raped her). The specific facts of this case support a finding that the kidnapping and rape were committed separately or with a separate animus. *See State v. Hudson*, 7th Dist. Mahoning No. 11 MA 77,

2013-Ohio-5529, ¶ 37 (rape and kidnapping do not merge when the restraint involved is more than what was necessary for the forced sexual encounter).

**{¶67}** Howard's first assignment of error is overruled.

### III

**{¶68}** Howard's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

CARR, P. J.
MOORE, J.
<u>CONCUR.</u>

<u>APPEARANCES:</u>

MALLORY J. HOLMES, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and MARY R. SLANCZKA, Assistant Prosecuting Attorney, for Appellee.