[Cite as *State v. Clay*, 2014-Ohio-3806.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

LARRENCE CLAY

    Appellant

C.A. No.     27015

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 12 07 2154

DECISION AND JOURNAL ENTRY

Dated: September 3, 2014

WHITMORE, Judge.

{¶1} Appellant, Larrence Clay, appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I

{¶2} In the afternoon of July 19, 2012, Clay, Jeremiah Walker, Derek Edwards, and James ("Linny") and Jordan Wells were walking through the Park Lane Apartment complex to a nearby gas station. The five men were walking in an "X" formation, with Edwards and Linny up front, Clay in the middle, and Walker and Jordan following approximately eight feet behind. As the group was walking a shot was fired. Edwards was struck by a single bullet to his neck and collapsed. He died shortly thereafter. After the shooting, Walker called 911 and the others fled. The Wells brothers did not run far and were approached by officers that had arrived on scene. Walker and Linny gave statements to the police. Jordan spoke to officers, but denied seeing anything.

{¶3} Based on the statements of Walker and Linny, the police identified Clay as a suspect. Officers arrived at Clay's parents' house approximately an hour-and-a-half after the shooting. When Clay came down the stairs to speak to officers he was shirtless, his arms were wet, he smelled strongly of bleach, and he was wiping his hands on a washcloth. Clay denied being at the scene of the shooting. After securing a search warrant, the police collected the washcloth and arrested Clay. Gunshot residue was later found on the washcloth.

{¶4} Clay was indicted for aggravated murder, murder, and having a weapon while under disability. The case proceeded to trial, and a jury acquitted Clay of aggravated murder, convicted him of having a weapon while under disability, and hung on the murder count. The State retried Clay on the murder charge, and he was convicted by jury. Clay now appeals and raises four assignments of error for our review. To facilitate the analysis, we rearrange his assignments of error.

II

Assignment of Error Number Two

LARRENCE CLAY'S CONVICTIONS FOR MURDER AND HAVING A WEAPON WHILE UNDER DISABILITY WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE 1, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶5} In his second assignment of error, Clay argues that his convictions are not supported by sufficient evidence. We disagree.

{¶6} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of

adequacy." *Thompkins* at 386. When reviewing a conviction for sufficiency, evidence must be viewed in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The pertinent question is whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶7} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955). This Court, therefore, reviews questions of sufficiency de novo. *State v. Salupo*, 177 Ohio App.3d 354, 2008-Ohio-3721, ¶ 4 (9th Dist.).

**Having a Weapon While Under Disability**

{¶8} Clay argues that his conviction for having a weapon while under disability is not supported by sufficient evidence because the State did not produce any physical evidence that Clay possessed a firearm. Because Clay was convicted for having a weapon while under disability at his first trial, we restrict our review to the evidence admitted at that trial.

{¶9} R.C. 2923.13(A)(3) prohibits, in part, a person from knowingly acquiring, having, carrying, or using any firearm if that person "has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession * * * [of] any drug of abuse." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶10} At trial, the parties stipulated that Clay had been "adjudicated a delinquent child for the commission of an offense that[,] if committed by an adult[,] would have been a felony offense involving illegal possession of a drug of abuse." Therefore, the only element the State

was left to prove was that Clay knowingly acquired, had, carried, or used a firearm. *See* R.C. 2923.13(A)(3).

**{¶11}** Walker testified that while walking behind Edwards, Linny, and Clay, he witnessed Clay pull out a gun and shoot Edwards. Additionally, Sergeant David Garro testified that, in his interview with Linny shortly after the shooting, Linny identified Clay "several times" as the shooter. Viewing the evidence in a light most favorable to the State, there is sufficient evidence to support Clay's conviction of having a weapon while under disability. Clay's second assignment of error, as it relates to his conviction for having a weapon while under disability, is overruled.

**Murder**

**{¶12}** Clay further argues that his murder conviction from his second trial is not supported by sufficient evidence because Walker's testimony contradicts the bullet trajectory testimony of the medical examiner. As this conviction stems from his second trial, we limit our review to the evidence presented at that trial.

**{¶13}** R.C. 2903.02(A) provides, in relevant part, that "[n]o person shall purposely cause the death of another." "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).

**{¶14}** Walker testified that he was walking approximately eight feet behind Clay when he witnessed Clay pull out a gun with his right hand, raise the gun above his head, stand on his tip toes, and fire a shot downward at Edwards. Walker explained that he saw the bullet strike

Edwards and exit out the front of his neck. According to Walker, Edwards then fell and blood started "gushing."

{¶15} Dr. George Sterbenz, a forensic pathologist and medical examiner with the Summit County Medical Examiner's Office, testified that Edwards died of a single gunshot wound to the neck. He explained that the bullet entered the right side of Edwards' neck behind his right ear. The bullet severed his neck bone, passed through his spinal cord, damaged his left jugular vein, and exited out the front, left side of his neck. Dr. Sterbenz stated that the bullet trajectory was from right to left, back to front, and had no significant up and down movement. He further testified that the entrance wound was symmetrical, indicating that the injury was consistent with the bullet being perpendicular at the time it entered Edwards' neck.

{¶16} Dr. Sterbenz explained that he cannot determine the position of the gun at the time it was fired because he does not know how Edwards was positioned when he was shot. However, based on the wound, Dr. Sterbenz testified that he was able to conclude that Edwards' neck was not sharply turned in any direction: left, right, up, or down. Yet, if Edwards was bending forward or slouching at the time he was shot, "then the angle of that trajectory could actually be directed down toward the ground."

{¶17} Walker testified that immediately prior to the gunshot, Edwards received a phone call on his cell. According to Walker, Edwards was shot while he was answering his phone. Linny testified that Edwards had just ended a phone call when he was shot.

{¶18} After a careful review of the record, we cannot conclude that Walker's testimony necessarily contradicts that of the medical examiner's. It is entirely possible that Edwards was bent slightly forward, focusing on his cell phone, when Clay fired his gun downward toward Edwards. Viewing the evidence in a light more favorable to the State, the State produced

sufficient evidence to support Clay's conviction of murder. Clay's second assignment of error, as it relates to his murder conviction, is overruled.

Assignment of Error Number Three

LARRENCE CLAY'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE 1, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶19} In his third assignment of error, Clay argues that his convictions are against the manifest weight of the evidence. We disagree.

{¶20} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *Thompkins* at 387, quoting *Black's* at 1594.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

**Having a Weapon While Under Disability**

{¶21} Clay argues that his conviction for having a weapon while under disability is against the manifest weight of the evidence because "there was no credible testimony that [Clay] possessed a firearm." Clay reiterates his argument that Walker's description of the events is wholly inconsistent with that of the medical examiner's testimony regarding the trajectory of the bullet. Further, Clay argues, the gunshot residue found on his washcloth could have been from materials other than gunshot primer.

{¶22} As discussed above, Walker's testimony is not in direct contradiction with that of the medical examiner's. Except for Dr. Sterbenz's testimony that Edwards' head was not turned sharply in any one direction, there was no testimony as to the position of Edwards' head at the time he was shot. Walker and Linny did testify that Edwards had either just answered his cell phone or just ended a call at the time he was shot. It is, therefore, an entirely rational conclusion that Edwards' neck was bent slightly forward because his attention was directed downward to his cell phone.

{¶23} Linny testified that he did not see who shot Edwards. He further testified that neither he, nor Jordan, nor Walker shot him. Linny said that he did not see anyone with a gun that night and that Clay was the only person not to return to the scene of the shooting that evening. Sergeant Garro testified that when he interviewed Linny at the scene shortly after the shooting, Linny told him "several times" that Clay was the shooter.

{¶24} Based on the interviews with Walker and Linny, officers identified Clay as a suspect. Officers arrived at Clay's home approximately an hour-and-a-half after the shooting. Officers David Crockett and Robert Lehman testified that Clay was upstairs when they entered the home. Officers Crockett and Lehman said that when Clay came down the stairs to speak to

them, he was not wearing a shirt, his arms were wet, and he was wiping his hands on a washcloth. Both officers described a strong odor of bleach as Clay approached them. Clay explained to Officer Crockett that he was told to clean the bathtub. Sergeant Garro testified that the officers were not able to corroborate that Clay was told to clean the bathtub. After securing a warrant, the officers collected Clay's washcloth and submitted it for gunshot primer residue ("GSR") analysis.

{¶25} In addition to the washcloth, officers submitted swabs taken from the hands of Edwards, Linny, and Jordan for GSR testing. No samples were taken from Walker or Clay. Donna Schwesinger, a forensic scientist in the trace evidence unit at the Ohio Bureau of Criminal Identification and Investigation ("BCI"), performed the GSR analysis. Schwesinger testified that the samples taken from the washcloth and the hands of Edwards and Jordan contained particles that were highly indicative of GSR. The sample taken from Linny's hands did not contain particles that were consistent with GSR. Schwesinger testified that GSR can be washed off or transferred by touch.

{¶26} Schwesinger explained that GSR analysis reports conclude that a sample contains particles that are "highly indicative" based on the presence of lead, barium, and antimony, "the spectra that we see[,] and the morphology of the particle * * *." Schwesinger further testified that other sources besides GSR, such as fireworks, brake linings, and air bags, contain particles of "lead[,] barium and antimony," but that those sources have a different "morphology" than GSR. Still, because there are other sources that contain similar components to GSR, analysis reports will only conclude that a sample contains particles that are "highly indicative" of GSR.

{¶27} After a careful review of the evidence presented at the first trial, we cannot conclude that this is the exceptional case where the jury lost its way in finding that Clay

possessed a weapon. *See Otten* at 340. Walker testified that Clay pulled a gun and shot Edwards. Sergeant Garro testified that he interviewed Linny shortly after the shooting and that Linny identified Clay "several times" as the shooter. Clay was not located until approximately an hour-and-a-half after the shooting. He smelled of bleach and had been seen wiping his hands on a washcloth, which contained particles that were highly indicative of GSR. No evidence was presented to suggest that Clay had been exposed to other materials that might contain the same particles as GSR. Clay's conviction for having a weapon while under disability is not against the manifest weight of the evidence. Accordingly, Clay's third assignment of error, as it relates to the weapon under disability conviction, is overruled.

**Murder**

**{¶28}** Clay argues that his conviction for murder is against the manifest weight of the evidence because "there was [ ] no credible sworn testimony that [Clay] was the person who shot [Edwards]." We disagree.

**{¶29}** Clay's argument again relies on the faulty premise that Walker's testimony is inconsistent with that of the medical examiner's. As we have discussed previously, Walker's version of the events does not necessarily conflict with the medical examiner's testimony. Dr. Sterbenz testified that, based on the wound track through his neck, Edwards did not have his head turned sharply in any direction. However, there is no evidence as to whether Edwards had his head slightly bowed, which is a reasonable inference based on the testimony that he was either answering or ending a call on his cell phone at the time he was shot.

**Walker**

**{¶30}** Walker testified that he, Edwards, Linny, Clay, and Jordan were walking in an "X" formation through the Park Lane Apartment complex on their way to a nearby gas station.

According to Walker, Edwards and Linny were walking up front, Clay was in between and behind them, and Jordan and Walker were walking in the back of the group. Walker testified that he was approximately eight feet behind Clay when he saw Clay pull a gun, raise it above his head, stand on his tip toes, and fire a shot downward at Edwards. Walker further testified that he saw the bullet strike Edwards and exit his neck. Walker said he watched Edwards fall and blood start "gushing" from his neck.

{¶31} After the shooting, Walker testified that he picked up Edwards' phone, which was on the ground with "[t]he battery [ ] on[,]" and tried to hand it to Linny to call the police. According to Walker, Linny did not call the police, but instead ran off, as did Jordan and Clay. Walker stated that Jordan fled from the immediate area, but that he never lost sight of him. Walker said Clay ran off and he never saw him again that evening. Walker testified that he used his own cell phone to call 911. When asked how soon after the shooting he called 911, Walker responded that he "was shocked for a minute. About ten minutes."

{¶32} Walker's 911 call was logged at 9:49 p.m. In the recording, the dispatcher asked Walker several times who shot Edwards. When the dispatcher asked Walker the first time, he replied "man, man I'm * * * it's f***ed up, man." In response to the second time the dispatcher asked Walker who shot Edwards, Walker replied, "I'll tell you that when you get here." Walker did not answer the question the third time, but instead replied, "man, man, I can't even think right now." The dispatcher then asked Walker who had a gun, and Walker replied "Larr[e]nce Clay." Toward the end of the five minute recording, the dispatcher asked Walker, "What is his name?" Walker replied, "I don't know his name." At trial, Walker explained that he was in shock when he called 911 and just wanted the police to hurry up and get there to help Edwards.

{¶33} Walker said that he was standing near Edwards when the police arrived and was placed in the back of a police cruiser for questioning. Officer Richard Kuznik testified that he noticed Walker standing among a group of males not far from Edwards. He noticed Walker because he appeared really nervous and scared. Officer Kuznik testified that Walker "seemed upset, very upset, very emotional, [ ] he kept walking back and forth." Officer Kuznik asked Walker to sit in his police cruiser and talk to him, and Walker agreed. According to Officer Kuznik, Walker was cooperative and polite, but seemed apprehensive about getting into the police cruiser. Officer Kuznik testified that Walker was very emotional and visibly upset, but began to open up to him after a few minutes. Officer Kuznik said Walker identified Larrence Clay as the person who shot Edwards. As Walker was talking with Officer Kuznik, Walker identified Jordan, who was standing about 30 feet from the police cruiser. Officer Kuznik testified that he then asked Jordan to sit in another cruiser to be interviewed.

{¶34} Walker was also interviewed at the scene by Detective Steve Snyder. Detective Snyder testified that he spoke to Walker for approximately 15 minutes in the back of Officer Kuznik's police cruiser. Detective Snyder described Walker as being very upset and emotional. According to Detective Snyder, Walker was never a suspect, and therefore, he did not swab Walker's hands to test for GSR residue. Detective Snyder testified that Walker detailed to him what had happened that evening and, based on his statements, Detective Snyder identified Clay as a suspect.

**Jordan**

{¶35} Jordan testified that he, Walker, Linny, Edwards, and a fifth person were walking side-by-side through the Park Lane Apartment complex to a nearby gas station when Edwards was shot. According to Jordan's testimony at trial, he did not know the identity of the fifth man.

Jordan testified that he and Walker were engaged in a separate conversation when Jordan's cell phone rang. Jordan said that when he turned his back to answer his phone, he heard a gunshot. He said he then saw Walker run past him, and Jordan took off running too. Jordan stated that he ran a good distance before returning to the scene to check on his brother, Linny. When he returned, Jordan said he saw Edwards lying on the ground and knelt down about six to seven feet from Edwards. According to Jordan, Walker had already returned and was on the phone. Linny arrived soon thereafter and tried to pick Jordan up off of the ground. Jordan testified that Walker tried to toss Linny a phone, but Linny did not catch it. According to Jordan, Walker then ran. Jordan denied having a gun that evening. He further testified that he did not see Walker or Linny with a gun and never saw the fifth man again.

{¶36} At the State's request, Jordan was declared a court's witness. Jordan acknowledged that he had made a prior recorded statement to the prosecutor. He admitted that he had previously identified Clay as the fifth man, but explained that he only did so after the police brought up Clay's name. According to Jordan, the prosecutor told him the State's version of the events before the recording of his interview began. Jordan testified that in his interview he answered the prosecutor's questions based on the details told to him by the prosecutor and not on his own personal knowledge. Investigator Ben Bergeron, with the Summit County Prosecutor's Office, testified that he was present during the prosecutor's interview of Jordan and denied that the prosecutor ever told Jordan his theory of the events surrounding the shooting.

{¶37} Jordan denied saying in his prior statement that the group was walking in an "X" formation, with Clay in the middle. However, Jordan did agree that he and Walker were walking in the back of the group. Jordan further acknowledged that in his prior statement to the prosecutor, he said he only ran a short 15 feet away, before returning and kneeling near Edwards.

**{¶38}** At trial, Jordan testified that he was standing with Linny when officers arrived on scene. Officers approached them and asked if they had seen the shooting. Jordan denied witnessing the shooting. Jordan testified that he answered this way because he did not see the shooting, he only heard it. He admitted that he did not tell the police that he was present in the immediate area during the shooting or that he had been with the group of men prior to the shooting. Sergeant Garro testified that he spoke with Jordan shortly after the shooting, but that Jordan did not provide any details about the events that transpired that evening. Sergeant Garro testified that he knew Jordan was not being honest when he said he was not there during the shooting. Further, Sergeant Garro was not surprised when swabs from Jordan's hands were found to contain particles highly indicative of GSR.

**Linny**

**{¶39}** Linny testified that he, Jordan, Edwards, Walker, and Clay were walking to through the Park Lane Apartment complex to a nearby gas station. According to Linny, he was walking up front next to Edwards, and the other three men were following behind. Linny testified that Edwards had stopped talking to him briefly because he was on his cell phone. Linny said that he heard a gunshot as soon as Edwards ended his call. Linny maintained that he did not see the shooter and, at the time, thought it was a sniper. After the shot, Linny said he ran. As he was running away, Linny heard a neighbor say, "You going to leave your Bro here? You going to leave him here hanging?" Linny then turned and saw Walker on the phone and Jordan kneeling about six feet from Edwards. Linny testified that he ran back to collect Jordan. While he was tending to Jordan, Walker tried to give him a phone. Linny said he did not want to touch the phone so he wiped it off and let it drop to the ground. Linny then left the immediate area with Jordan. Shortly thereafter, the two were approached by officers and asked if they had seen

anything related to the shooting. Linny admitted he had and went with the officers. Jordan denied seeing anything.

{¶40} Linny testified that when he spoke with Sergeant Garro that evening, he only identified four people as being present at the time of the shooting. Linny told Sergeant Garro that he, Edwards, Clay and "J" were together. He made no mention of Walker or Jordan by name. Linny denied that he ever told Sergeant Garro who the shooter was. At the State's request, Linny was declared a court's witness. After the State played Linny's recorded interview with Sergeant Garro, Linny admitted that he had identified Clay as the gunman and provided a physical description of him. Linny explained that he only told Sergeant Garro that he *believed* Clay was the shooter because he was the only one that had not returned to the scene. At trial, Linny maintained that he did not see who shot Edwards.

{¶41} Sergeant Garro testified that when he interviewed Linny shortly after the shooting, he was "upset," "agitated," and "[e]motional." According to Sergeant Garro, Linny was upset that people could see him talking to the police in the back of a police cruiser. Sergeant Garro said that he knew Linny was not being completely honest about who all was present at the time of the shooting, but that this did not make him a suspect in the killing. He explained that Linny's statement "meshed" with Walker's. Based on those statements, Sergeant Garro identified Clay as a suspect in the shooting.

### Other Witnesses

{¶42} Zteven Ellis testified that the evening of the shooting he returned home from work about 10:10 p.m. Ellis explained that he was home a few minutes before his pregnant wife requested that he walk up to the nearby gas station to get her a candy bar. While walking his dog to the gas station, Ellis heard "two pops." Approximately 10 seconds later, Ellis heard an

aluminum can on the ground. When he looked up, Ellis said, he saw a man running toward him. Ellis testified that he saw the man put his hand behind his back and believed that he was tucking a gun away. Ellis stated that he did not see a gun, but "saw something metal." On his way home from the gas station, he heard about the shooting and gave a statement to the police. Ellis identified the aluminum beer can that he believed was either dropped or kicked by the man fleeing the area. The Crime Scene Unit collected the beer can as evidence. Investigator Bergeron followed up with Ellis in March 2013, approximately eight months after the shooting. A photo array was then conducted, and Ellis identified a Steven Oliver as the man he saw running from the area that evening. The record does not indicate whether the police interviewed Oliver or not.

{¶43} Joyce Fullard testified that she lives in the area around Park Lane Apartments and, on the evening of the shooting, she saw a man get out of a white car parked in the apartment's parking lot. She noticed him get out of the car, walk slowly around the other parked cars, and head toward the apartments. Fullard testified that she then went inside her house. Approximately three to four minutes later, she heard gunshots. Fullard described the man as a black male and said she could not provide any more details than that. She became aware that someone had been shot and saw lots of officers in the area that evening, but no one came to talk to her so she did not provide a statement.

{¶44} Dominique Lopp was engaged to Edwards at the time of his murder. Lopp testified that she spoke with Edwards by phone after he arrived at the Park Lane Apartments. According to Lopp, Edwards told her that he was going to visit Ciara, a friend that lived in the apartment complex. Shortly after Lopp hung up with Edwards, she saw a posting on Facebook about a shooting at Park Lane Apartments. Lopp testified that the posting was from a Facebook

friend named "Demere" and it said, "I just seen someone get shot to the head. So sad." Lopp explained that Demere is one of 2000 Facebook friends and that she does not know who he is or if that is his real name. Lopp testified that she told the police about the posting, but they never requested that she try to find it again. Lopp stated that she, on her own, searched for the posting later, but was unable to find it. Sergeant Garro testified that he asked Lopp to look for the posting. Inspector Bergeron testified that he was not able to find anyone with the name of "Demere," but that he did identify a person with a similar name, a Dmar Perry. According to Inspector Bergeron, he was not able to confirm Dmar Perry was a person's real name and did not find a Facebook posting related to the shooting.

{¶45} Kenneth Kennerly, a firefighter and paramedic with the Akron Fire Department, testified that he arrived at the Park Lane Apartments in response to a 911 call. Kennerly said that when he approached the area where Edwards was lying, he noticed a "guy" taking pictures with a cell phone. According to Kennerly, the guy walked away as the paramedics approached. Kennerly testified that there were other people around the scene too. Kennerly said he noticed a group of people on a nearby porch, who appeared to be playing a card game. Kennerly was also approached by a six-year-old girl, who told him that someone had been shot. Officer Michael Stanar testified that the paramedics were approaching Edwards when he arrived on scene. Officer Stanar stated that lots of people had gathered in the area, but he did not notice anyone playing cards. According to Officer Stanar, all civilians were at least 15 to 20 yards from Edwards.

{¶46} Lopp testified that calls and text messages were being sent from Edwards' phone after his death. Lopp admitted that Ciara told her about the messages and she did not have any personal knowledge of them. Sergeant Garro testified that he "received reports from the family

that people were using [Edwards' cell phone] to call and leave unkind or threatening messages." Sergeant Garro said he subpoenaed Edwards' phone records and was unsuccessful in his attempt to figure out who might have the phone based on the numbers called. Inspector Bergeron testified that he also tried to track down Edwards' phone, but, because it was a pre-pay phone, he was not able to do so.

**GSR Evidence**

**{¶47}** Schwesinger, the forensic scientist from BCI, testified that there is no exact science as to how far GSR particles go or where they land when a gun is fired. GSR distribution can be affected by environmental conditions, such as by blowing wind. Further, GSR can be easily removed from someone's hands by washing them or by touching something, causing particles to transfer to the item touched. Schwesinger explained that she uses a scanning electron microscope to search for "particles that contain lead, barium, [and] antimony." The microscope is set to move on to another sample "once it finds so many" particles. Schwesinger testified that she notes how many particles are found on a sample, but does not include that in her report. Schwesinger explained that the quantity of particles found depends on numerous factors, including the time lapsed from the shooting and the activity of the individual.

**{¶48}** Schwesinger testified that she performed GSR analysis on the following samples: (1) swabs of Edwards' hands, (2) swabs of Jordan's hands, (3) swabs of Linny's hands, (4) a washcloth, (5) Clay's shorts, (6) Clay's socks, and (7) Clay's shoes. Particles "highly indicative of [GSR]" were found on Edwards' hands, Jordan's hands, the washcloth, and Clay's shorts. Schwesinger detailed the number of particles found on each sample and explained that swabs from the left and right hand of an individual are treated as one sample. Schwesinger identified one particle highly indicative of GSR on Edwards' left hand. Because Edwards' left hand

contained a positive result, the sample from Edwards' right hand was not tested. Schwesinger found twelve particles highly indicative of GSR on Jordan's left hand; the sample from his right hand was not tested. One particle highly indicative of GSR was found on one side of the washcloth; no GSR particles were found on the other side of the washcloth. Two particles highly indicative of GSR were found on Clay's shorts collected at the Summit County Jail when he was arrested.

{¶49} Clay argues that the weight of the evidence supports a finding that Jordan was closer to the gun when it was fired because he had more GSR particles on him. However, Clay was not found until an hour-and-a-half after the shooting. His arms were wet, he smelled of bleach, and he was wiping his hands on a washcloth. Due to the length of time that had lapsed since the shooting and the fact that Clay had his hands in water, we are not persuaded that the smaller number of GSR particles found on Clay weigh heavily against his conviction.

{¶50} After a careful review of the evidence presented at the second trial, we cannot conclude that this is the exceptional case where the jury lost its way in convicting Clay of murder. *See Otten* at 340. Walker steadfastly maintained that Clay pulled a gun and shot Edwards. Linny testified that he did not see who shot Edwards, but admitted that he told Sergeant Garro that he believed Clay was the shooter because Clay was the only person that did not return to the scene. Jordan testified that he did not see who shot Edwards and that when he identified Clay as the shooter in his prior statement to the prosecutor he was merely restating what the prosecutor had told him. The jury chose to believe one witness over another. "[T]he [jury] is best able to view witnesses and observe their demeanor, gestures and voice inflictions, and use these observations in weighing the credibility of the proffered testimony." *State v. Cook*,

9th Dist. Summit No. 21185, 2003-Ohio-727, ¶ 30, quoting *Giurbino v. Giurbino*, 89 Ohio App.3d 646, 659 (8th Dist.1993).

**{¶51}** Clay's conviction of murder is not against the manifest weight of the evidence. Accordingly, his third assignment of error, as it relates to the murder conviction, is overruled.

Assignment of Error Number One

THE TRIAL COURT ABUSED IT'S (SIC) DISCRETION AND COMMITTED PLAIN ERROR WHEN IT DECLARED A STATE'S WITNESS TO BE A COURT WITNESS AND FAILED TO GIVE LIMITING INSTRUCTIONS, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1 AND 10 OF THE OHIO CONSTITUTION.

**{¶52}** In his first assignment of error, Clay argues that the court abused its discretion in declaring Linny a court's witness, allowing the State to impeach its own witness without a showing of surprise, and failing to give the jury limiting instructions regarding the use of impeachment evidence.

**{¶53}** "A trial court possesses the authority in the exercise of sound discretion to call individuals as witnesses of the court." *State v. Adams*, 62 Ohio St.2d 151 (1980), paragraph four of the syllabus. *See also* Evid.R. 614(A) ("The court may, on its own motion or at the suggestion of a party, call witnesses * * *."). The court's decision to declare an individual a court's witness is reviewed under an abuse of discretion standard. *State v. Apanovitch*, 33 Ohio St.3d 19, 22 (1987). An abuse of discretion indicates that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶54}** Linny testified in both of Clay's trials. He testified consistently in both trials that he did not see who shot Edwards. In the first trial, the State did not question Linny about his

recorded interview with Sergeant Garro, which was conducted shortly after the shooting.[1]  In the second trial, the State asked Linny if he remembered telling Sergeant Garro who the shooter was. When he said that he did not, the State attempted to refresh Linny's recollection with a transcript of his recorded interview.  Linny then denied making statements in the transcript.  The court granted the State a recess to refresh Linny's recollection with the recording of his interview.

{¶55}  When the court reconvened, Clay objected to playing the recorded interview in open court to impeach Linny.  Clay argued that Linny's testimony was consistent with his testimony at the prior trial.  Therefore, according to Clay, the State could not show the necessary element of surprise under Evid.R. 607(A) to impeach its own witness.  The State argued that it was surprised that Linny would deny making statements in the interview with Sergeant Garro despite being shown a recording of the interview.  Furthermore, the State argued, Linny was never asked about his interview with Sergeant Garro during the first trial so it was not aware that Linny would deny his statements.  Ultimately, the court found that the State had not shown surprise because it knew Linny would not identify Clay as the shooter.  The State then asked the court to call Linny as a court's witness.

{¶56}  The court found that Linny was "clearly [ ] reluctant to be honest."  Further, the court found, because the prior statement was recorded, "there's no dispute as to [the] existence or * * * contents of [the recorded interview]."  The court ruled that "in the interest of justice" Linny should be declared a court's witness, thereby giving both sides the opportunity to cross-examine him to determine if he was being truthful in his prior interview or at trial.

---

[1] The State did ask Sergeant Garro about Linny's statement to him the night of the shooting. According to Sergeant Garro's testimony, Linny identified Clay as the shooter "several times" that night.

**{¶57}** "It is well-established that a trial court does not abuse its discretion in calling a witness as a court's witness when the witness's testimony would be beneficial to ascertaining the truth of the matter and there is some indication that the witness's trial testimony will contradict a prior statement made to police." *State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, ¶ 44 (2d Dist.), quoting *State v. Schultz*, 11th Dist. Lake No. 2003–L–156, 2005-Ohio-345, ¶ 29. "However, 'where impeachment is a mere subterfuge to get evidence before the jury which is not otherwise admissible, impeachment of a party's own witness has been held improper.'" *Arnold* at ¶ 45, quoting Annotation, *Calling and Interrogation of Witnesses by Court under Rule 614 of the Federal Rules of Evidence*, 53 A.L.R. Fed. 498, 500-501 (1981).

**{¶58}** The State argued that it should be permitted to play Linny's prior statement made to Sergeant Garro because it was surprised that Linny would deny making statements after being shown the interview. The court found there was no surprise to the State because it knew Linny would not identify Clay as the shooter based on his testimony at the first trial. It was only then that the State asked the court to declare Linny a court's witness. Because Evid.R. 614(A) may not be used for the sole purpose of circumventing Evid.R. 607(A), we conclude the court abused its discretion in calling Linny as a court's witness so that the State could impeach him with his recorded interview with Sergeant Garro. *See State v. Wynn*, 2d Dist. Montgomery No. 25097, 2014-Ohio-420, ¶ 51.

**{¶59}** However, Clay has offered no argument as to how he was prejudiced by the State playing his interview to the jury. While the prosecutor's questions reveal that the substance of Linny's prior statement to apparently be Linny identifying Clay as the shooter and providing a description of him, the recorded interview was not offered by Clay as an exhibit, and therefore, we do not know precisely what was said and, thus, cannot discern prejudice. *See State v.*

*McGowan*, 9th Dist. Summit No. 27092, 2014-Ohio-2630, ¶ 6 ("When an appellant does not provide a complete record to facilitate our review, we must presume regularity in the trial court's proceedings and affirm.") (Internal quotations and citations omitted.). Furthermore, when asked about his prior identification, Linny explained that he told Sergeant Garro only that he *believed* Clay was the shooter because he was the only person that did not return to the scene. Even after the recording was played, Linny maintained that he did not see Clay with a gun or see who shot Edwards. Further, Sergeant Garro testified that he interviewed Linny shortly after the shooting and, based on that interview, identified Clay as a suspect. Sergeant Garro stated that Walker's statements to Detective Snyder "meshed" with Linny's. Sergeant Garro testified that he then sought an arrest warrant for Clay based on the "two eyewitnesses who were independently telling the same story."

{¶60} This court will not reverse a trial court's ruling based on a harmless error. *See* Crim.R. 52(A). An error is harmless if it does not affect a defendant's substantial rights. *Id*. Clay makes no argument explaining how his substantial rights were affected by the State playing the recorded interview in light of the testimony of Walker, Sergeant Garro, and Detective Snyder. We decline to make an argument for him. *See Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998) ("If an argument exists that can support [an] assignment of error, it is not this court's duty to root it out."). Furthermore, Walker testified that he saw Clay shoot Edwards, making Linny's testimony at trial that he did not see who shot Edwards of nominal help to Clay and, by extension, the improper impeachment of that testimony inherently less prejudicial. There was also testimony that, when the police officers discovered Clay, he was wiping his hands with a washcloth, reeked of bleach, and denied even being at the scene of the shooting. A gunshot residue test revealed gunpowder particles on Clay's hands as

well as the washcloth. In light of the evidence at trial and the relative minimal probative value of Linny's testimony, and the limited record before us, we must conclude that playing the recorded interview in order to impeach Linny's testimony was harmless.

**Limiting Instructions**

{¶61} Clay also argues that the court committed plain error when it failed to provide limiting instructions for the impeachment evidence used during the testimony of Linny and Jordan. According to Clay, "[w]ithout a proper instruction being given as to either Jordan or Linny, it was left for the jury to use the prior statements as substantive, not impeachment, evidence." Clay did not request a limiting instruction or object to the trial court's failure to provide one. Therefore, he has forfeited all but plain error. *See State v. Risden*, 2d Dist. Montgomery No. 22930, 2010-Ohio-991, ¶ 137.

{¶62} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. To establish plain error,

> "[f]irst, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights [ ]' [to the extent that it] * * * affected the outcome of the trial."

(Alterations sic.) *State v. Hardges*, 9th Dist. Summit No. 24175, 2008-Ohio-5567, ¶ 9, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶63} We initially note that the trial court's failure to give the limiting instruction was clearly error. *See State v. Nixon*, 12th Dist. Warren No. CA2011-11-116, 2012-Ohio-1292, ¶ 22.

However, after reviewing the record, we cannot conclude that the court's failure to give limiting instructions affected the outcome of the trial. Walker testified that he saw Clay pull out a gun and shoot Edwards. According to Walker, he saw the bullet pass through Edwards' neck, Edwards collapse, and then blood start "gushing" from his neck. Officer Kuznik testified that Walker's testimony was consistent with the statement he gave to the officers shortly after the shooting.

{¶64} Linny testified that he did not see the shooter. Linny explained that he had previously told Sergeant Garro that he only believed Clay was the shooter because Clay was the only person that did not return to the scene. Sergeant Garro testified that when he interviewed Linny shortly after the shooting, he was "upset," "agitated," and "[e]motional." Sergeant Garro stated that he relocated where he was conducting his interview with Linny, in part, because "Linny was upset that people could see him talking to the police in the back of a police car." In the end, Sergeant Garro testified that Linny's story "meshed" with Walker's, and, based on those interviews, Sergeant Garro identified Clay as a suspect in the shooting death of Edwards.

{¶65} Jordan testified that he did not see who shot Edwards. Jordan explained that he only mentioned Clay's name because he was merely repeating what the prosecutor had told him. Jordan said that this portion of the interview happened prior to the beginning of the recording. Inspector Bergeron testified that he was present during the prosecutor's interview of Jordan and that some discussion occurred before the recording began. However, according to Inspector Bergeron, the prosecutor never told Jordan what he believed happened.

{¶66} Officer Crocket testified that when he saw Clay approximately an hour-and-a-half after the shooting, Clay was in a home on Whitney Avenue. When Clay came downstairs to talk to the officers his arms were wet, he reeked of bleach, and he was wiping his hands on a

washcloth. Officer Crockett said Clay denied being at the scene of the shooting and Clay explained that he smelled of bleach because he was told to clean the bathtub. Sergeant Garro testified that the officers were not able to confirm Clay was told to clean the tub. GSR testing revealed particles highly indicative of GSR on Clay's shorts and the washcloth he had been using to wipe his hands.

{¶67} Appellate courts should recognize plain error "if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." (Internal quotations and citations omitted). *Barnes*, 94 Ohio St.3d at 27. However, after a careful review of the record, we cannot conclude that the court's failure to give limiting instructions regarding the impeachment evidence rises to the level of plain error as we are not convinced that it affected the outcome of the trial.

{¶68} Clay's first assignment of error is overruled.

### Assignment of Error Number Four

THE TRIAL COURT ABUSED IT'S (SIC) DISCRETION IN DENYING THE MOTIONS FOR A MISTRIAL AND A NEW TRIAL, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE 1, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶69} In his fourth assignment of error, Clay argues that the court abused its discretion by denying his motions for a new trial and mistrial based on the State's untimely disclosure of a witness with "potentially exculpatory information."

{¶70} At the outset, we must note that Clay has not appealed from the June 26, 2013 journal entry denying his motion for a new trial. Clay has only appealed from the June 12, 2013 sentencing entry. Because he has not properly appealed the court's denial of his motion for a new trial, we decline to address that portion of his argument. Therefore, we limit our review to

his argument regarding the court's denial of his oral motion for a mistrial, made just before the jury's verdict was announced.

{¶71} "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Litton*, 9th Dist. Summit No. 26812, 2014-Ohio-577, ¶ 27, quoting *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "The essential inquiry on a motion for mistrial is whether the substantial rights of the accused are adversely affected." *State v. Boden*, 9th Dist. Summit No. 26623, 2013-Ohio-4260, ¶ 35, quoting *State v. Howes*, 9th Dist. Summit No. 24655, 2010-Ohio-421, ¶ 11. "The granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *State v. Treesh*, 90 Ohio St.3d 460, 480 (2001). An abuse of discretion indicates that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶72} In Clay's second trial, after the jury had reached a verdict, but before that verdict was announced, the State became aware of an individual that might have information related to the shooting. The prosecutor explained that the night before, May 22, 2013, he reviewed a file of a defendant named Dennis Cook. Cook was arrested for carrying a concealed weapon on August 19, 2012, one month after Edwards' murder. At that time, Cook informed an officer that he was carrying the gun because his friend, Edwards, had been murdered recently and that he had received some threatening text messages from Edwards' phone after his murder. When the officer asked Cook if he had any information about the homicide, Cook responded that he might. Cook was not interviewed again until May 22, 2013, when the prosecutor requested that Inspector Bergeron go to speak with him.

{¶73} Inspector Bergeron recorded his interview with Cook. However, this recording was not properly admitted into evidence. From the details that are discussed on the record, it appears Cook had heard rumors that Walker was the gunman. Cook had also heard rumors that Clay was the gunman. Additionally, he described what he heard the motives might have been. Cook also said that he attended the candlelight vigil for Edwards the night after the shooting and found a pair of gloves and hat. Cook said he gave them to "the brother of his mother's children" and requested that they be passed along to Edwards' brother. Evidently Cook recognized the hat as Edwards', but did not know if the gloves belonged to him too. Edwards' family denied receiving any hat or gloves. The court reviewed Cook's interview and denied Clay's motion for a mistrial. Additionally, the court denied Clay's request to voir dire Cook.

{¶74} Clay does not argue that Cook's recorded interview revealed exculpatory information. Instead, Clay argues that he was prevented from interviewing Cook to determine if he might have information that would lead to exculpatory information. While the court's denial of Clay's request to voir dire Cook is troublesome, Clay cannot establish prejudice based on the information in the record. Because his argument necessarily relies on information outside of the record, i.e., what Cook would have said if interviewed by Clay, it is a more suitable argument for a petition for post-conviction relief.

{¶75} Because Clay cannot establish prejudice based on the information contained in the record, his fourth assignment of error is overruled.

III

{¶76} Clay's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

BELFANCE, P. J.
MOORE, J.
CONCUR.

APPEARANCES:

JEREMY A. VEILLETTE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.